Laurence ("Laird") J. Lucas (ISB # 4733)
Bryan Hurlbutt (ISB # 8501)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
llucas@advocateswest.org
bhurlbutt@advocateswest.org

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, and WILDEARTH GUARDIANS, | ) ) ) | No. 01:19-cv-065 |
| *Plaintiffs,* | ) ) ) | **COMPLAINT** |
| v. | ) ) ) | |
| U.S. SHEEP EXPERIMENT STATION, and USDA AGRICULTURAL RESEARCH SERVICE, | ) ) ) ) | |
| *Defendants.* | ) ) | |

## INTRODUCTION

1.      This is the latest in a series of actions before this Court seeking to require the USDA Sheep Experiment Station ("Sheep Station") to comply with law in its authorization of domestic sheep grazing within vital habitat for bighorn sheep, grizzly bear, greater sage-grouse and other wildlife species.

2.      Specifically, Plaintiffs challenge Defendants' violations of the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA) in issuing a July 2017 Final Environmental Statement (FEIS) and July 2018 Record of Decision (ROD) for the "U.S. Sheep Experiment Station Grazing and Associated Activities Project."  Plaintiffs also

COMPLAINT –                          1

challenge the "Errata" to the FEIS and ROD, which Defendants used to substantially change grazing practices without any public disclosure or comment; and the Supplemental Information Report (SIR) issued along with the ROD, which is also arbitrary and capricious and was relied upon by Defendants to avoid conducting updated NEPA analysis to assess significant new information that arose in the year after the FEIS was issued.

3.      Through the FEIS and ROD, as well as the Errata and SIR, Defendants have determined to continue domestic sheep grazing on Sheep Station property and federal grazing allotments without conducting the "hard look" required by NEPA at likely adverse impacts on bighorn sheep, grizzly bear, and greater sage-grouse; and they relied on misstatements and speculative assertions to reject reasonable and necessary alternative actions, including ending Sheep Station grazing in critical wildlife habitats.

4.      Defendants also avoided evaluating the harmful impacts posed by Sheep Station grazing in wildlife habitats by claiming that other agencies – principally the Forest Service – have adequately conducted their own adequate NEPA analyses, which is false.

5.      For these and other reasons, the Sheep Station FEIS and ROD, as well as the Errata and SIR, must be reversed and set aside by this Court as violating NEPA and the APA, and remanded for a fully NEPA-compliant analysis.  Plaintiffs reserve the right to seek injunctive relief to prevent irreparable harm from these violations while Plaintiffs' claims are being adjudicated and Defendants come into compliance with law.

## JURISDICTION AND VENUE

6.      Jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 & 1346, because this action involves federal defendants and arises under the laws of the United States, including NEPA, 42 U.S.C. §§ 4321 *et seq.*, and the APA, 5 U.S.C. §§ 701 *et seq.*

COMPLAINT –                                   2

7.     An actual, justiciable controversy exists between Plaintiffs and Defendants.  The requested relief is proper under 28 U.S.C. § 2201–02 and 5 U.S.C. §§ 701–706.  The challenged agency actions are final and subject to this Court's review under 5 U.S.C. §§ 702-706.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Plaintiff Western Watersheds Project and Defendant Sheep Station reside in this district, and affected public lands and resources in question are located in this district.

9.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

10.     Plaintiff Western Watersheds Project (WWP) is an Idaho non-profit corporation, which is dedicated to protecting and conserving the public lands and natural resources in Idaho and the American West.  WWP is headquartered in Hailey, Idaho, and has additional staff and offices in Boise and other western states. WWP, as an organization and on behalf of its over 9,500 members and supporters, is concerned with and active in seeking to protect and restore the wildlife throughout the West, including in Idaho. WWP has an organizational interest in ensuring the Sheep Station's compliance with all federal laws, and has participated in prior litigation against it before this Court.

11.     Plaintiff WildEarth Guardians (Guardians) is a non-profit organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the American West. Guardians has over 66,000 members and supporters, many of whom have particular interests in bighorn sheep, grizzly bears, and sage-grouse. Guardians has an organizational

interest in ensuring the Sheep Station's compliance with all federal laws, and has participated in prior litigation against it before this Court.

12.     Plaintiffs' and their staff and members have been long-time advocates for wildlife in the regions affected by the challenged Sheep Station grazing and FEIS/ROD, and have long-standing concerns about the threats to bighorn, grizzly, and sage-grouse from sheep grazing on public lands.  Plaintiffs have engaged in public outreach and education, advocacy with agencies, agency administrative processes, and litigation to promote the protection of bighorn sheep, grizzly bears, and sage-grouse from domestic sheep grazing on public lands and their herders.

13.     These interests are directly harmed by Defendants' action challenged herein. Plaintiffs' staff and members use and enjoy the public lands in and around the Sheep Station and its grazing allotments to observe, photograph, and study native species.  Plaintiffs and their members derive recreational, scientific, aesthetic, spiritual, and commercial benefits from the existence of wild populations of bighorn sheep, grizzly bears, and sage-grouse.

14.     Plaintiffs will continue to use public lands in and around the areas affected by the challenged FEIS and ROD in 2019 and beyond, and their interests will continue to be adversely affected and irreparably injured if Defendants continue to authorize grazing and related Sheep Station activities without adequate NEPA review.  These are actual, concrete injuries caused by Defendants' violations of NEPA and the APA that would be redressed by the relief sought.

15.     Defendant United States Sheep Experiment Station (Sheep Station) is an agricultural experiment station focusing on domestic sheep.

16.     Defendant USDA Agricultural Research Service (ARS) is the principal in-house research agency of the United States Department of Agriculture (USDA). It operates the Sheep Station and issued the FEIS, SIR, and ROD challenged in this action.

COMPLAINT –                                          4

## STATEMENT OF RELEVANT FACTS

### A.    The U.S. Sheep Experiment Station

17.    The Sheep Station was established by ARS in 1915 as a sheep research facility. It grazes approximately 3,000 mature sheep, which increase to about 6,500 sheep at the end of each lambing season.  All Sheep Station sheep are owned by the University of Idaho (UI).

18.    As shown by Map 2 from the FEIS (below), Sheep Station lands include a 27,930-acre Headquarters ranch, the 2,600-acre Humphrey Ranch, and the 1,200-acre Henninger Ranch. These properties are located north of Dubois, Idaho in wildlife habitat within the Upper Snake River Plain and the Centennial Mountains. The Sheep Station also owns 16,600 acres in the Centennial Mountains, which it has split into East and West Summer Ranges.

Final Environmental Impact Statement



Map 2. Proposed Action (alternative 1) overview with allotments and sheep trails

Agricultural Research Service, U.S. Sheep Experiment Station   261

19.     Additionally, as shown on the map above, the Sheep Station utilizes over 30,000 acres of other public land allotments through Memoranda of Understanding with federal agencies. These include the Mud Lake Feedlot on Department of Energy (DOE) land, and the Meyers Creek, East Beaver, and Snakey-Kelly Canyons allotments on the Caribou-Targhee National Forest ("NF"), administered by the U.S Forest Service.

20.     The Sheep Station also previously utilized the Bernice allotment on Bureau of Land Management ("BLM") lands, but as noted below the BLM terminated that grazing authorization in 2012 because of conflicts with bighorn sheep.

21.     Much of the land managed and utilized by the Sheep Station is located in and around the Centennial Mountains—an ecologically important corridor on the west side of Yellowstone National Park that connects the Park with large wilderness and roadless areas in Idaho and Montana. These lands and the Centennial Mountains corridor provide habitat for many sensitive and imperiled wildlife species, including Rocky Mountain bighorn sheep, Greater Yellowstone Ecosystem grizzly bears, and greater sage-grouse.

22.     Sheep Station grazing and related activities pose serious threats to these and other wildlife species, as detailed below—yet the Defendants have consistently refused to recognize these threats, or the best available science documenting them, in violation of NEPA.

**B.     Procedural Background**

23.     The Sheep Station has a long track record of flouting NEPA and other environmental laws.  As the FEIS itself states, the only reason the current NEPA analysis even began was because of the lawsuit filed in this Court over a decade ago.

24.     Specifically, in 2007, Plaintiff WWP and another group brought suit in this Court, challenging the Sheep Station's decades-long refusal to comply with NEPA and examine the

impact of their actions on wildlife. *See* Complaint, ECF No. 1, *Center for Biological Diversity & Western Watersheds Project v. U.S. Sheep Experiment Station et al.,* No. 07-cv-0279-E-BLW (D. Idaho June 25, 2007). The parties reached a settlement in that case requiring completion of a NEPA analysis by November 28, 2008. *Id.* ECF Nos. 26 & 26-1 ("2008 Settlement").

25.      The Sheep Station failed to meet that deadline. Instead of the NEPA-compliant final decision required by the 2008 Settlement, the Sheep Station issued an "interim" decision allowing domestic sheep grazing to continue until 2010 without NEPA analysis.

26.      In 2009, the delisting of the Greater Yellowstone Ecosystem grizzly bear under the Endangered Species Act (ESA)was enjoined and vacated. *Greater Yellowstone Coal. v. Servheen*, 672 F. Supp. 2d 1105 (D. Mont. 2009), *aff'd in part and rev'd in part*, 665 F.3d 1015 (9th Cir. 2011). In response, the Sheep Station again extended its authority to graze without NEPA analysis, but ended grazing in the Summer East and Meyers Creek allotments until NEPA analysis was completed.

27.      In July 2011, a Draft EIS (DEIS) was issued for public comment, and a public tour of the Sheep Station was conducted in August 2011. WWP and other conservation groups attended this site visit, and Plaintiffs submitted extensive comments on the DEIS.

28.      Soon after the comment period, BLM notified the Sheep Station that grazing authorization would lapse in December 2012 on the Bernice allotment, and would not be renewed.  Because of that claimed "changed circumstance," the Sheep Station initiated a "supplemental DEIS" process in early 2013.

29.      Around the same time, FWS issued a Biological Opinion ("BiOp") under the ESA addressing Sheep Station activities on grizzly bears, which WWP and others challenged in litigation before this Court in 2013.  *See* Complaint, ECF No. 1, *Cottonwood Envtl. Law Ctr.,*

COMPLAINT –                              7

*WWP, et al.  v. United States Fish & Wildlife Serv.*, No. 4:13-cv-235-BLW, (D. Idaho May 17,

2013).  A settlement was reached in that litigation in 2014, which required completion of a new

BiOp by June 1, 2014, and prohibited grazing on the Summer East, Summer West, and Meyers

Creek allotments until July 1, 2014.  *See id.*, ECF No. 31.

30.     The 2014 BiOp issued by FWS was subsequently challenged as legally deficient

in another action by WWP and Guardians, among others. *Cottonwood Envtl. Law Ctr. et al. v.*

*U.S. Sheep Experiment Station*, No. 9:14-cv-00192-DLC (D. Mont. June 23, 2014).  A settlement

agreement was reached in that case after UI determined not to graze sheep in the Meyers Creek

and Summer East and West allotments of the Centennial Mountains pending resolution of legal

issues and completion of necessary environmental reviews. *Id.,* ECF No. 55 & 55-1.

31.     In March 2016, the Sheep Station issued a "Revised DEIS" for public comment.

Rather than conduct any new public scoping comment period, the Sheep Station considered old

comments from 2011 in developing the March 2016 Revised DEIS.

32.     Plaintiffs submitted extensive comments on the Revised DEIS, emphasizing that

the Sheep Station needed to fully analyze all adverse impacts of Sheep Station grazing on grizzly

bear, bighorn sheep, and other wildlife, and evaluate a full range of alternatives, including

ceasing all Sheep Station grazing to protect wildlife and other environmental values.

**C.     FEIS, SIR, and ROD/Errata**

33.     In July 2017, Defendants issued the FEIS, which identified "Modified Alternative

1" as the "Preferred Alternative," and continued "historical and ongoing grazing and associated

activities necessary to achieve the mission of the station."

34.     The FEIS continues numerous factual and legal omissions, misstatements and errors, and does not comply with requirements of NEPA and the NEPA regulations, as alleged further herein below.

35.     Although the Sheep Station apparently planned to issue the ROD shortly after the FEIS – the cover page of the ROD has a date of September 2017 – it was delayed until July 2018 for unknown reasons.  In the interim, significant new information and changed circumstances arose about Sheep Station activities that were not addressed in the FEIS, including the closure of the Forest Service Snakey-Kelly allotments in response to Plaintiffs' litigation before this Court, *Western Watersheds Project & WildEarth Guardians v. United States Forest Service*, No. 1:17-cv-434-CWD, 2017 US Dist. LEXIS 193021 (D. Idaho Nov. 20, 2017).

36.     On July 23, 2018, Defendants issued the ROD, along with the SIR which determined that a Supplemental EIS was unnecessary despite the closure of the Snakey-Kelly allotments and other changes since the FEIS was released in July 2017.  Defendants did not allow public comment on the SIR.

37.     The ROD adopted the Preferred Alternative from the FEIS, but stated that "minor adjustments have been made to the decision," which were determined to be "within the range of effects analyzed in the FEIS," according to the SIR.

38.     The ROD included Appendix C, entitled: "Errata for the Final Environmental Impact Statement," which purportedly "clarified" or "corrected" errors in the FEIS, but actually made significant changes to the FEIS and the adopted alternative regarding sage-grouse – changes that also were never subjected to public scrutiny.

39.     The FEIS and ROD failed to analyze direct and indirect effects of Sheep Station grazing on the Forest Service and DOE lands used for Sheep Station grazing.  Instead of

analyzing such impacts, the FEIS and ROD asserted that the Forest Service and DOE have prepared their own NEPA analyses for those allotments, and "it is neither required nor appropriate that the Sheep Station revisit these decisions."

40.     However, no NEPA-compliant analyses have been prepared for the Forest Service and DOE lands used for Sheep Station grazing, according to all public information that Plaintiffs have found; and it is contrary to fact and law for the Sheep Station to premise its FEIS and ROD on the assertion that analysis of impacts of Sheep Station grazing on these allotments has been completed in compliance with NEPA.

41.     Specifically, the Forest Service has not conducted NEPA-compliant analysis of Sheep Station grazing on the East Beaver or Meyers Creek allotments.  The Forest Service has found these allotments need NEPA analysis, but scheduled it to be completed in 2019 and 2025 respectively.

42.     The FEIS and ROD claim that the Sheep Station may utilize the Snakey-Kelly allotments for grazing.  However, because of the high risk of spreading diseases to bighorn sheep, the Forest Service agreed to settle recent Snakey-Kelly litigation before this Court by stopping grazing on those allotments until additional environmental analysis is performed.  *See* Notice of Settlement (ECF No. 44) and Order Approving Settlement (ECF No. 45), *WWP v. Forest Service*, No. 1:17-cv-434-CWD (D. Idaho 2018).  The Forest Service has not performed such analysis, and the Snakey-Kelly allotments remain closed to sheep grazing.

43.     Plaintiffs are informed and believe, and allege thereon, that DOE also has not conducted any NEPA analysis of Sheep Station grazing on the Mud Lake Feedlot.

44.     The challenged FEIS and ROD are arbitrary and capricious, and in violation of NEPA and the APA, by failing to fully analyze potential direct and indirect impacts of grazing in

COMPLAINT –                                   10

the Snakey-Kelly, Meyers Creek, East Beaver Creek, and Mud Lake Feedlot allotments, when the Forest Service and DOE have not conducted such analysis.

45. In adopting the Preferred Alternative, the ROD made false and unsubstantiated assertions about the lack of significant effects on wildlife, the ability of conservation measures to mitigate negative effects, and the beneficial effects of Sheep Station activities.

46. In truth, the Sheep Station's grazing and associated activities pose numerous severe threats to wildlife, which the FEIS and ROD fail to adequately evaluate and assess, and which the "conservation measures, design features and mitigation" measures set forth in the ROD cannot ameliorate, as detailed below.

### D.   Rocky Mountain Bighorn Sheep

47. North America has lost around 95% of its bighorn sheep and most remaining herds are small and susceptible to extirpation.  One of the primary reasons for this decline is that bighorn sheep are very susceptible to respiratory disease caused by pathogens carried by domestic sheep. When domestic sheep transmit this pathogen to bighorns, it triggers large-scale pneumonia die-offs within bighorn populations and poor lamb survival for many years.  The risk of disease transmission is high because these species are related and gregarious and thus will seek each other out in the wild.  The common occurrence of domestic sheep straying from their band, and bighorn sheep travelling outside of their normal home range, make it very difficult to keep the species separated even when their ranges are miles apart and herders are watching.

48. The Sheep Station FEIS and ROD dismiss this danger by asserting that Best Management Practices ("BMPs") are in place to minimize the risk.  Yet, bighorn experts agree that BMPs such as those used by the Sheep Station are ineffective at keeping bighorn and domestic sheep separate.

COMPLAINT –                                     11

49.     The Forest Service and this Court have acknowledged the risk that domestic sheep present to bighorn sheep and the failure of BMPs to protect bighorn populations on public lands, *See, e.g., Idaho Wool Growers Ass'n v. Vilsack,* 7 F. Supp. 3d 1085 (D. Idaho 2014), *aff'd* 816 F.3d 1095 (9th Cir. 2016); *Western Watersheds Project et al. v. BLM et al,* No. 4:09-cv-507-BLW, 2009 WL 3335365 (D. Idaho, October 14, 2009); *Western Watersheds Project. v. U.S. Forest Serv.*, No. 4:07-cv-151-BLW, 2007 WL 3407679, (D. Idaho, Nov. 13, 2007); *Western Watersheds Project. v U.S. Forest Serv.,* 2007 WL 1729734, No. 4:07-cv-151-BLW (D. Idaho, June 13, 2007).

50.     Most recently, this Court stopped Sheep Station domestic sheep grazing on the Forest Service's Snakey-Kelly allotments because of the high risk of disease transmission to the nearby bighorn population and the unreliability of BMPs. *See WWP v. Forest Serv.*, No. 1:17-cv-434-CWD, 2017 US Dist. LEXIS 193021 at *35 (D. Idaho Nov. 20, 2017) (noting that ("[e]ven with flawless execution of BMPs, there is no way the Sheep Station or Forest Service can ensure that domestic sheep will not wander, and that … rams will not make forays on or near the allotments while the large herds of domestic sheep are grazing").  BLM previously withdrew from its agreement with the Sheep Station to graze the Bernice allotment because of the risk to this same bighorn population and lack of effective BMPs.

51.     Nevertheless, the Sheep Station FEIS and ROD approved domestic sheep grazing in and around bighorn sheep habitats, including within the bighorn range overlapping the Snakey-Kelly allotments, and allowing grazing just over a mile from another herd and within foray distance of others. The FEIS and ROD improperly minimize the presence of nearby bighorn sheep populations and disregard these legal and scientific precedents, violating NEPA and the APA.

COMPLAINT –                              12

52.     Additionally, the FEIS's cumulative effects analysis of Forest Service allotments found the potential for Sheep Station grazing on the Snakey-Kelly allotments to negatively affect bighorn sheep, but incorrectly claimed that ending grazing there would not eliminate this risk because others could take over the allotments. This is untrue, because the Caribou-Targhee Forest Plan governing these allotments requires grazing to be phased out whenever possible.

53.     For these and other reasons to be briefed before the Court, the Sheep Station FEIS and ROD are arbitrary, capricious, and not in accordance with NEPA's requirements in failing to fully assess likely impacts to bighorn sheep.

**E.     Grizzly Bear**

54.     The Greater Yellowstone Ecosystem ("GYE") contains one of the remaining grizzly populations in the United States, and the GYE grizzly is listed as threatened under the ESA because of the isolation and lack of connectivity between grizzly bear populations.

55.     For their long-term survival, GYE grizzlies must be able to intermix with other grizzly populations to maintain genetic diversity.  Therefore, the protection of corridors between GYE and high-quality habitat in Idaho and Montana is essential for long-term grizzly viability.

56.     The Centennial Mountains provide just such a corridor for GYE grizzlies. However, the Sheep Station lands and grazing allotments occupy and fragment this irreplaceable corridor, negatively impacting grizzlies and other wildlife.

57.     The Meyers Creek allotment is inside the Grizzly Primary Conservation Area, and a 2012 FWS Biological Opinion found Sheep Station use of Meyers Creek and East Summer Range was "likely to adversely affect" the grizzly bear.

58.     BLM has also noted the likelihood of adverse effects to grizzly bears by Sheep Station grazing in the East and West Summer Ranges, Humphrey Ranch, Henninger Ranch, and

the East Beaver and Meyers Creek allotments.  These adverse effects threaten individual

grizzlies and the entire GYE grizzly population.

59.    The Sheep Station FEIS and ROD never objectively examined the potential

impacts of grazing on individual grizzlies. Instead, they identified a list of BMPs that the Sheep

Station claims will reduce or eliminate conflicts with grizzlies.  The FEIS also asserted these are

nondiscretionary measures, but there is no mechanism to enforce or monitor them in place.

60.    The FEIS and ROD failed to present any evidence that these BMPs have been

proven effective or are supported by empirical evidence, and many of them mirror the BMPs that

this Court and others have repeatedly held were inadequate to prevent contact between bighorn

and domestic sheep.

61.    The ability of BMPs to keep grizzlies away from domestic sheep—a popular food

source, especially now that whitebark pine seeds are less abundant—is also questionable.

Without evidence, BMPs cannot be used to claim that potential conflicts would be ameliorated.

62.    The Sheep Station FEIS focused on three forms of grizzly conflicts with sheep:

grizzlies becoming food conditioned, killing sheep, and attacking herders. But, if these occur, the

Sheep Station claims adverse impacts to grizzlies are unlikely and would barely impact

individual grizzlies or the population. This claim is based on unsupported assumptions and

misleading claims.

63.    Furthermore, the FEIS arbitrarily dismissed the possibility of poaching, asserting

that Sheep Station herders are federal employees and have less personal interest in protecting

their sheep and livelihood than ranchers.  The Sheep Station ignores, however, that if conflicts

with grizzlies result in closing these allotments, the FEIS states the Sheep Station will fire the

herders and hire researchers. Accordingly, there is a strong incentive for herders to not report

COMPLAINT –                                        14

contacts with grizzlies and kill them. Many hypothesize that this is exactly what occurred in 2012 when a grizzly's telemetry collar was found cut off on a Sheep Station allotment and a spent casing was found where the Sheep Station herders had been camped.

64.     The Sheep Station also failed to account for the fact that as the GYE grizzly bear population increases, more bears need to move into and through the area. The FEIS acknowledges that the GYE grizzly has expanded its range, distribution, and numbers and that the GYE population is approaching carrying capacity. Nevertheless, the FEIS uses decade-old data to claim that there will be minimal grizzly conflicts.

65.     The FEIS asserted that no mortality or change in habitat use will occur from the Sheep Station activities because, as claimed above, BMPs will ameliorate any conflicts. However, some BMPs, such as hazing, are specifically designed to make grizzlies avoid the area.

66.     The FEIS and ROD further dismiss the importance of Sheep Station allotments to the expansion of grizzly range. Sheep Station grazing areas, however, occupy much of the center and elevated portion of a narrow wildlife corridor that is crucial to allowing the GYE grizzly bear to spread to other suitable habitats and improve the species' genetic diversity. The 10% comprised of the Sheep Station land serves as a chokepoint damaging the ability of grizzlies to expand into Idaho and Montana.

67.     For these and other reasons to be briefed before the Court, the Sheep Station FEIS and ROD are arbitrary, capricious, and not in accordance with NEPA's requirements in failing to fully assess likely impacts to grizzly bear.

**F.     Greater Sage-Grouse**

68.     Greater sage-grouse populations have been decimated by habitat degradation and fragmentation as is well-known to this Court from prior cases. *See, e.g.*, *W. Watersheds Project*

*v. Jewell*, 56 F. Supp. 3d 1182 (D. Idaho 2014); *W. Watersheds Project v. Salazar*, No. 08-cv-516-BLW, 2011 WL 4526746 (D. Idaho 2011); *W. Watersheds Project v. U.S. Fish and Wildlife Serv.*, No. 06-cv-277-BLW, 535 F. Supp.2d 1173 (D. Idaho 2007).

69.     Sheep Station Headquarters, Humphrey Ranch, and Henninger Ranch, as well as the Mud Lake Feedlot and parts of the Snakey-Kelly and East Beaver allotments, are located in priority sage-grouse habitats as identified by the Idaho Department of Fish and Game (IDFG), and by federal agencies (BLM and Forest Service) through their 2015 National Greater Sage-grouse Planning Strategy and associated land use plan amendments.

70.     Headquarters, in particular, plays an important role for sage-grouse populations in the area, as it contains breeding sites (leks) and associated pre-nesting, nesting, and brood-rearing habitats. Accordingly, when Sheep Station actions threaten sage-grouse, they do so on some of the most important sage-grouse habitat in the state and the country.

71.     These threats come from sheep presence and grazing, fencing, prescribed burns, and other habitat disturbances.  The Sheep Station's FEIS and ROD make token attempts to address these issues, but fail to take a true "hard look" at the problems and instead present one-sided discussions that minimize or avoid well-documented science and studies contrary to the Sheep Station's views.

72.     For example, fences and structures pose numerous hazards to sage-grouse, particularly when they are near leks and other important habitats or when they bisect movement corridors, because sage-grouse avoid areas with high predation risks and can be killed by fences.

73.     The FEIS disclosed that there are 180 miles of pasture fence on the Headquarters, Humphrey, and Henninger properties; but the FEIS and ROD misleadingly assert that these fences do not pose a large threat to sage-grouse, including by ignoring the facts that fences are

COMPLAINT –                              16

immediately adjacent to numerous leks, and few if any leks are more than a half-mile from fences, raising the likelihood that sage-grouse nesting and brood-rearing habitats are adversely impacted.

74.     Additionally, even though the majority of the BLM land surrounding the Headquarters is part of a Sagebrush Focal Area, the Sheep Station did not consider the impact of having their outer fences right next to this valuable breeding territory, and the FEIS provided no data on leks on the outside edges of the Sheep Station borders.

75.      Furthermore, sage-grouse often migrate from their breeding grounds on and around the Headquarters property.  Migrating birds, especially those which have to cross the southern section of Headquarters, will have to cross numerous fences, further exposing this vulnerable species to unnecessary risk that the Sheep Station failed to consider.

76.     The FEIS and ROD assert that risks posed to sage-grouse from fences will be reduced or eliminated by implementing BMPs, such as adding reflectors to fences near leks and in estimated flight zones; but fence markers only eliminate a portion of the sage-grouse collision deaths and BMPs fail to address adverse impacts such as increased predation and sage-grouse avoidance or abandonment of nesting and brood-rearing habitats from fence fragmentation impacts.

77.     The impact on sage-grouse habitat usage and availability—caused by sheep destroying sage-grouse habitat and sage-grouse instinctively avoiding grazing areas—is another harm the FEIS and ROD fail to fully address; instead, they assert that BMPs will make grazing "beneficial" to sage-grouse.  Again, the Sheep Station's reliance on such BMPs lacks substantial scientific support or validation, and fails to acknowledge the extensive agency and independent science on sage-grouse habitats and adverse grazing impacts.

COMPLAINT –                                17

78.     Moreover, in the Errata attached to the ROD, the Sheep Station removed a major BMP that required sheep grazing to avoid leks, nesting areas, and early brood-rearing areas during the lekking, nesting, and brooding seasons. This substantial change in the proposed action did not undergo public comment, and violates NEPA.

79.     For these and other reasons to be briefed before the Court, the Sheep Station FEIS and ROD (including the Errata) are arbitrary, capricious, and not in accordance with NEPA's requirements in failing to fully assess likely impacts to sage-grouse.

**G.     Exaggerated Impacts of Closing Allotments**

80.      Defendants further violated NEPA and the APA by exaggerating the alleged impacts of closing allotments under alternatives not chosen in the ROD.

81.     Proposed modified alternative 5 would have stopped the Sheep Station from grazing in the Snakey-Kelly allotments.  In dismissing alternative 5, the Sheep Station repeatedly asserted that being unable to graze in Snakey-Kelly would require reducing the sheep herd by 40%, severely limiting research. As addressed above, however, the Sheep Station was stopped by the prior litigation in this Court from grazing in the Snakey-Kelly allotments until the Forest Service completes a NEPA analysis, which has not occurred.  The FEIS and ROD failed to address this key fact in rejecting modified alternative 5.

82.     The Sheep Station says its ideal herd size ranges from 1,500 to 3,000 mature sheep depending on research needs. Accordingly, without the Snakey-Kelly allotments, the Sheep Station should have been forced to reduce their herd to a maximum of 1,800 sheep, but apparently has not done so, thus illustrating the false or misleading nature of the Sheep Station's justification for rejecting alternative 5.

COMPLAINT –                                      18

83.     Furthermore, the Sheep Station determined in the SIR that the inability to graze on Snakey-Kelly would not substantially affect the proposed action, and thus did not require supplementary analysis, even though the FEIS earlier claimed its loss would seriously impede the Sheep Station's mission.

84.     Additionally, proposed modified alternative 3 would have stopped the Sheep Station from grazing on the East Summer Range, West Summer Range, and Humphrey Ranch east of Beaver Creek, as well as on the East Beaver and Meyers Creek allotments.  In dismissing alternative 3, the Sheep Station repeatedly asserted that being prevented from grazing sheep in these areas would force their herd to be reduced by 50% and severely limit research.

85.     However, the Sheep Station has not used the East and West Summer Allotments since 2009 and 2012, respectively; and the Meyers Creek allotment has not been used since 2012 either.  While this still allows use of Humphrey Ranch and the East Beaver allotment, and thus is unlikely to require the full 50% reduction that the FEIS claimed would be required by alternative 3, it still would likely have resulted in some forced reduction of sheep if the FEIS's claims were accurate, particularly when combined with the loss of the Snakey-Kelly allotments.

86.     In actuality, even with both these events that the FEIS claimed would severely limit the Sheep Station's sheep population and research, the Sheep Station website, last updated on June 26, 2018, says the Sheep Station "currently has approximately 3,000 mature sheep." This is the maximum amount that the Sheep Station has said it could use for research at any time, and demonstrates that multiple allotments could be – and were – closed without impacting the research sheep population at all, contrary to what the FEIS asserted.

87.     Additionally, the Sheep Station repeatedly claims that many of its grazing allotments are crucial because closing them would require housing sheep at the Mud Lake

Feedlot—an act that would allegedly interfere with the utility of Sheep Station research. However, when the Snakey-Kelly allotments were closed, removing most of the Sheep Station's winter grazing areas, the Supplemental Information Report did not state that the sheep would be housed at Mud Lake. Instead it stated that UI, which owns the sheep, would relocate the herd during that period. This again demonstrates, contrary to assertions made throughout the FEIS and ROD, that the Sheep Station allotments are not crucial to ensuring continued Sheep Station grazing. Private allotments are available to fill gaps in the Sheep Station's seasonal grazing and a system is already in place to facilitate that transfer.

88.     The Sheep Station FEIS also alleges that all alternatives (aside from the "preferred" alternative) impermissibly interfere with research—going so far as claiming that under alternative 2 "research would essentially be terminated," even though the FEIS later stated that the Sheep Station would hire additional researchers under alternative 2 to replace herders. One of the primary justifications for this claimed interference is the alleged importance of the wide range of habitats available on different Sheep Station lands.

89.     However, an independent analysis performed by Dunrovin Ranch and Research on Sheep Station research produced between 2000 and 2015 found that the Sheep Station only published three papers requiring land in the Centennials, all of which could have been conducted elsewhere. Additionally, they found no studies on range assessment, range management techniques, or sheep husbandry economics that were specific to producers using pastures similar to those in the Centennials.

90.     This means that all the Sheep Station research during that period was broadly applicable and was not narrowly limited to being useful only in similar ecosystems. Accordingly, the similarity of the Sheep Station grazing lands to the majority of sheep grazing lands is

irrelevant, because generally applicable research can be done elsewhere.  This further undermines the Sheep Station's stated reasons for keeping the allotments open.

## FIRST CLAIM FOR RELIEF
### FEIS And ROD Violate NEPA & APA

91.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

92.     This First Claim for Relief challenges Defendants' violations of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and NEPA's implementing regulations, 40 C.F.R. § 1501 *et seq.*, in adopting the Sheep Station FEIS and ROD.  Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

93.     One of NEPA's fundamental goals is to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. § 4321. Accordingly, a federal agency must consider alternatives to the proposed action and evaluate and disclose all environmental impacts. 40 C.F.R. §§ 1502.14(a) & 1508.9.  Impacts include direct, indirect, and cumulative effects of the proposed action and its alternatives on ecological, aesthetic, historic, cultural, economic, social, and health interests.  40 C.F.R. §§ 1508.7 & 1508.8.

94.     NEPA's purpose is "to foster excellent action," and the "NEPA process is intended to help officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c).  The NEPA process requires that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* at 1500.1(b).

95.     Information that agencies are required to gather and disclose during the NEPA process "must be of high quality."  *Id.*  "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."  *Id.*

96.     The scope of NEPA review is quite broad, including disclosure and consideration of all reasonable alternatives, 40 C.F.R. § 1502.14(a). The federal agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated"; "[d]evote substantial treatment to each alternative considered in detail including the proposed action"; and "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(a)-(c).

97.     As alleged hereinabove, and as will be presented in further briefing before the Court, the FEIS and ROD violate NEPA's requirements and the APA in multiple ways, including but not limited to the following:

A.     Failing to take a "hard look" in a scientifically and factually valid manner at likely impacts of Sheep Station activities upon bighorn sheep, grizzly bear, and sage-grouse, among others;

B.     Misstating and exaggerating the impacts of closing allotments under the non-preferred alternatives, in order to justify selecting the preferred/chosen alternative;

C.     Making false or misleading statements, unsupported assumptions, and other errors and omissions in addressing potential impacts and alternatives;

D.     Improperly relying on unproven and inadequate BMP's to minimize likely impacts to wildlife and justify choosing the preferred alternative; and/or

E.     Avoiding conducting an analysis of direct and indirect effects of Sheep Station grazing by falsely asserting that the Forest Service and DOE have conducted such analysis for allotments within their jurisdictions.

98.     Accordingly, the FEIS and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. 706(2).

WHEREFORE, Plaintiffs pray for relief as set forth below.

## SECOND CLAIM FOR RELIEF:
### Errata To FEIS and ROD Violates NEPA & APA

99.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

100.    This Second Claim for Relief challenges Defendants' use of the "Errata" to the ROD and FEIS to modify sheep grazing in sage-grouse habitats in significant ways that were never publicly disclosed and for which public comment was not allowed, in violation of NEPA and the APA.  Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

101.    Under NEPA and its implementing regulations, Defendants are obligated to provide for public notice and comment on their proposed action(s) and alternatives through a NEPA-compliant analysis, in this case an EIS.

102.    Defendants unlawfully modified the preferred alternative in the FEIS, and the chosen alternative in the ROD, through use of the "Errata" that substantially altered sheep grazing requirements in sage-grouse habitats, contrary to well-established science and without public notice or comment.

103.    Accordingly, by adoption of the unlawful Errata, the FEIS and ROD are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the

COMPLAINT –                                  23

meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. 706(2).

## THIRD CLAIM FOR RELIEF:
### SIR Violates NEPA & APA

104.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

105.    This Third Claim for Relief challenges Defendants' use of the SIR to avoid conducting complete NEPA analysis before issuing the ROD, despite significant new information and changed circumstances that arose during the year-long delay between when the FEIS and ROD were issued.  Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

106.    Under NEPA and its implementing regulations, Defendants are obligated to ensure that their Sheep Station ROD was based on fully NEPA-compliant analysis, including by allowing public comment upon their whole NEPA analysis used to support the ROD.

107.    Defendants issued the SIR at the same time as the ROD, without public notice or comment, to contend the July 2017 FEIS was adequate and no new or supplemental NEPA was required, despite the year-long delay in issuing the ROD after the FEIS. During that year, significant new information and changed circumstances did arise that warranted a supplemental EIS, including this Court's ruling that the Snakey-Kelly allotments pose a high risk to bighorn sheep and BMPs would not sufficiently reduce that risk, and the resulting closure of the Snakey-Kelly allotments.  The SIR failed to mention the Court's decision.

108.    The SIR was arbitrary and capricious in concluding that the FEIS was adequate, when it was not; and Defendants further violated NEPA and the APA by not allowing public notice and comment before approving the ROD based on the faulty SIR.

109.     Accordingly, the SIR and the ROD are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. 706(2).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

a)   Declare, order and adjudge that the challenged Sheep Station FEIS and ROD violate NEPA and the APA for any or all of the reasons set forth above;

b)   Declare, order and adjudge that the challenged SIR also violates NEPA and the APA;

c)   Reverse and set aside the challenged FEIS, SIR, and ROD for violating NEPA and the APA, and remand for completion of a timely NEPA-compliant EIS and ROD;

d)   Enter such preliminary and/or permanent injunctive relief as Plaintiffs pray for hereafter;

e)   Award Plaintiffs their reasonable attorney fees, costs, and litigation expenses, under the Equal Access to Justice Act, and/or any other applicable provision of law; and

f)   Grant such further and additional relief as the Court deems just and proper in order to remedy the violations of law alleged herein and to protect the interests of the Plaintiffs, the public, and the public lands and wildlife resources at issue.

DATED:  February 20, 2019                    Respectfully submitted,

*/s/ Laurence ("Laird") J. Lucas*
Laurence ("Laird") J. Lucas (ISB # 4733)
Bryan Hurlbutt (ISB # 8501)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
llucas@advocateswest.org
bhurlbutt@advocateswest.org

Attorneys for Plaintiffs