Laurence ("Laird") J. Lucas (ISB # 4733)
Bryan Hurlbutt (ISB # 8501)
Garrison Todd (ISB # 10870)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
llucas@advocateswest.org
bhurlbutt@advocateswest.org
gtodd@advocateswest.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT, WILDEARTH GUARDIANS, and CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) ) | No. 01:19-cv-065-REB |
| *Plaintiffs,* | ) ) ) | **PLAINTIFFS' OPENING BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) | |
| U.S. SHEEP EXPERIMENT STATION, and USDA AGRICULTURAL RESEARCH SERVICE, | ) ) ) ) | |
| *Defendants.* | ) | |

## **INTRODUCTION**

The Centennial Mountains along the Idaho/Montana border offer vital habitat for many imperiled wildlife species, including grizzly bear, bighorn sheep, and greater sage-grouse. But domestic sheep grazing by the USDA Sheep Experiment Station ("Sheep Station"), on federal ranch properties and grazing allotments in and around the Centennials, threatens these species, including by creating conflicts with grizzlies and impeding their recovery, spreading fatal diseases to bighorns, and degrading sage-grouse priority habitats.

For decades, the Sheep Station evaded addressing the adverse environmental impacts of its activities under the National Environmental Policy Act (NEPA). Finally, after several lawsuits, the Sheep Station released its first-ever Final Environmental Impact Statement (FEIS) in July 2017, which recommended the Sheep Station "continue historical and ongoing grazing and associated activities" to carry out its research mission. The Sheep Station then issued a July 2018 Record of Decision (ROD) to adopt that recommendation.

As explained below, the FEIS and ROD must be reversed and remanded by this Court for violating NEPA's "hard look" requirements. Even though several Forest Service allotments historically used by the Sheep Station have been closed to domestic sheep grazing in recent years because of conflicts with grizzly bears or bighorn sheep, the FEIS and ROD downplayed or ignored those facts. And even though these allotments have experienced serious sheep/wildlife conflicts in recent years, the FEIS and ROD refused to evaluate direct and indirect impacts of resumed sheep grazing there—asserting that prior NEPA analyses already examined them, which is demonstrably untrue. The FEIS and ROD also relied on misstatements, omissions, and speculation to minimize adverse impacts of grazing, and to arbitrarily reject alternatives, such as ending Sheep Station grazing in critical wildlife habitats.

For these and other reasons below, the Court should grant Plaintiffs' summary judgment motion, and reverse and remand the Sheep Station FEIS and ROD for violating NEPA and the Administrative Procedure Act (APA).

<u>**STATEMENT OF RELEVANT FACTS**</u>

**The Sheep Station and Threatened Wildlife.**

The Sheep Station is run by the USDA Agricultural Research Service ("ARS"). *See* Plaintiffs' Separate Statement of Undisputed Facts (SOF), ¶¶ 1. The Sheep Station supports research using domestic sheep owned by the University of Idaho ("UI") under a Memorandum of Understanding with UI. *Id.*



Map 2. Proposed Action (alternative 1) overview with allotments and sheep trails

As shown in FEIS Map 2 above, the Sheep Station encompasses several ranch properties owned by ARS, plus allotments managed by other agencies. SOF ¶¶ 4–5. The ARS properties include the Headquarters, Humphrey, and Henninger ranches, and the East and West Summer Ranges; while the non-ARS allotments include the Mud Lake Feedlot on Department of Energy

(DOE) land, and the Forest Service's Snakey and Kelly Canyons, East Beaver Creek, and Meyers Creek allotments. *Id.*

These Sheep Station lands and allotments are located in and around the Centennial Mountains, which run east-west along the Idaho/Montana border, and connect Yellowstone National Park—and the Greater Yellowstone Ecosystem (GYE) around it—with large wilderness and roadless areas in Idaho and Montana. SOF ¶ 17. The Centennials offer important habitat for many imperiled wildlife species, including GYE grizzly bear, Rocky Mountain bighorn sheep, Canadian lynx, wolverine, gray wolves, and others. *Id.*

The GYE grizzly bear population is listed as threatened under the Endangered Species Act (ESA) partly because of its lack of connectivity to other grizzly populations. *See Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1014–21 (D. Mont. 2018). The Centennials provide a migration corridor for GYE grizzly bears to expand and genetically intermix with other grizzly populations. SOF ¶¶ 20–21, 33–36. However, Sheep Station lands and allotments occupy the center of this vital corridor, and research suggests there is a bottleneck inhibiting grizzly movement past the Sheep Station. *Id.* To minimize grizzly bear conflicts, and as a result of litigation before this and other courts, Sheep Station grazing was halted on the Meyers Creek allotment and East Summer Range in 2008, and on West Summer Range in 2013. *Id.*

Sheep Station grazing also threatens bighorn sheep herds in the region. SOF ¶¶ 6, 14, 27–32. Pathogens transmitted from domestic sheep to bighorns can trigger large-scale pneumonia die-offs and poor lamb survival within bighorn populations. *Id.* The risk of disease transmission is high because these species seek each other out in the wild. *Id.* In 2012, the BLM ended sheep grazing on its Bernice allotment, previously used by the Sheep Station, because sheep grazing there threatened bighorn sheep. SOF ¶ 6.

Citing conflicts with bighorn sheep, Magistrate Judge Dale of this Court issued an injunction halting sheep grazing on the Forest Service's Snakey and Kelly Canyons allotments in November 2017, and those allotments will remain closed to sheep grazing indefinitely under settlement of that case, until the Forest Service may conduct new NEPA analysis. SOF ¶ 14; *W. Watersheds Project v. U.S. Forest Serv.*, No. 1:17-CV-434-CWD, 2017 WL 5571574 (D. Idaho Nov. 20, 2017).

Sheep Station grazing and infrastructure threaten greater sage-grouse populations and habitats as well. SOF ¶¶ 37–38. The Headquarters, Humphrey, and Henninger ranches, plus the Mud Lake Feedlot and parts of the East Beaver allotment, are located in priority sage-grouse habitats. *Id.* These lands contain breeding sites ("leks") and nesting and brood-rearing habitats; and Headquarters ranch is part of a migration corridor in priority sage-grouse habitat. *Id.* Fences for grazing management pose numerous threats to sage-grouse. *Id.* Yet the FEIS downplayed the importance of sage-grouse habitats and the threats posed by sheep grazing; and the ROD even eliminated management restrictions for grazing in sage-grouse habitats on the Headquarters ranch, which the FEIS identified as necessary to reduce conflicts. SOF ¶¶ 3, 39.

**History of Sheep Station NEPA Analysis**

In 2007, Plaintiffs filed litigation in this Court challenging the Sheep Station's decades-long refusal to comply with NEPA and examine the impact of its actions on wildlife. SOF ¶¶ 18–19. Settlement in that case required completion of NEPA analysis by November 2008. *Id.* But the Sheep Station failed to meet that deadline, and instead issued an "interim" decision allowing domestic sheep grazing to continue until 2010 without NEPA analysis. *Id.*

In 2010, the Sheep Station issued a Decision Notice in response to the relisting of GYE grizzly bear under the ESA, which halted Sheep Station grazing on the Meyers Creek allotment

and East Summer Range pending ESA consultation and completion of an EIS. SOF ¶¶ 20–21. In

July 2011, the Sheep Station issued a Draft EIS (DEIS); but after BLM determined in 2012 that it

would not renew sheep grazing authorization on the Bernice allotment, the Sheep Station cited

that "changed circumstance" to initiate a "supplemental DEIS" process in early 2013. SOF ¶ 22.

Eventually, in March 2016, the Sheep Station issued a "Revised DEIS" for public comment. *Id.*

Plaintiffs submitted extensive comments throughout the EIS process. SOF ¶ 23. They

provided substantial science and emphasized the need for the EIS to fully analyze adverse

impacts of Sheep Station grazing on grizzly bear, bighorn sheep, sage-grouse and other wildlife,

and to evaluate a full range of alternatives, including ceasing Sheep Station grazing to protect

wildlife and other environmental values. *Id.*[1]

The Sheep Station eventually issued the FEIS in July 2017, entitled "U.S. Sheep

Experiment Station Grazing and Associated Activities Project." *See* AR 31005–448 (copy of

FEIS). The FEIS proposed several alternatives that would have reduced or eliminated Sheep

Station grazing to protect wildlife, but identified modified alternative 1 as the "proposed action"

and "preferred alternative," which would "continue historical and ongoing grazing and

associated activities necessary to achieve the mission of the station." SOF ¶¶ 2, 4–8. Under that

alternative, the Sheep Station would conduct sheep grazing on all of the ARS lands and non-ARS

allotments historically used by the Sheep Station, except for the Bernice allotment. *Id.* Modified

alternative 1 proposed to resume grazing at prior levels on the East and West Summer Ranges

and Meyers Creek allotment, even though sheep grazing was suspended there during the NEPA

process. *Id.*

---

[1] Plaintiffs' extensive participation in the NEPA process and their comments, along with the accompanying Declarations of Bonnie Altshuld, Ken Cole, Greg Dyson, Scott Lake, Sarah McMillan, and Andrea Santarsiere, establish Plaintiffs' Article III standing to bring this case.

Despite the importance of the the non-ARS allotments to the Sheep Station's grazing schemes, the FEIS focused its discussion on the Sheep Station's ARS properties—not even disclosing the size of the non-ARS allotments. *Id.* Moreover, even though the Forest Service allotments were the focus of grizzly and bighorn sheep conflicts and past closures, the FEIS refused to analyze the direct or indirect effects of its proposal to resume sheep grazing on them and the Mud Lake Feedlot. SOF ¶ 9. The FEIS stated: "Separate NEPA analyses were prepared and decisions were made by the respective agencies to authorize sheep grazing on the lands they administer.  It is neither required nor appropriate that the Sheep Station revisit these decisions." *Id.* (quoting AR 31102). The FEIS did not support this claim with any citation to other agency NEPA analysis or decisions. *Id.*

In fact, the record shows the Mud Lake Feedlot has never had NEPA analysis, the Beaver Creek allotment only had outdated and partial Environmental Assessments (EAs) from the mid-1990's, and the Meyers Creek allotment had a 2007 "categorical exclusion" (CE), which does not constitute NEPA analysis. SOF ¶ 10–14. The Snakey-Kelly Canyons allotments also had no valid NEPA, as Judge Dale noted in issuing the November 2017 injunction. *Id.*

The Sheep Station inexplicably waited a year after the FEIS before it issued the ROD in July 2018. SOF ¶ 3. The ROD adopted the "preferred alternative" (modified alternative 1) from the FEIS, with "minor adjustments." *Id.* Among those, ROD Appendix C was an "Errata" which deleted language from the FEIS imposing sheep grazing management restrictions in sage-grouse habitat. *Id.*; *see* AR 37069–70. Yet the Errata did not undergo public notice and comment. *Id.*

Along with the ROD, the Sheep Station issued a Supplemental Information Report (SIR) that summarily addressed the Judge Dale's decision closing the Snakey-Kelly allotments, new information on grizzly bear conflicts on Sheep Station allotments, and additional comment

letters. The SIR determined that none of these constituted significant new information, so no supplemental NEPA analysis was required. SOF ¶¶ 3, 15–16. The SIR and ROD failed to acknowledge the FEIS' prior contention that closing Snakey-Kelly would have a "major impact" on the Sheep Station research program, and refused to reevaluate whether the FEIS' analysis of the various alternatives remained valid in light of the loss of the Snakey-Kelly allotments. *Id.*

The FEIS and ROD dismissed all alternatives to reduce or eliminate sheep grazing in wildlife habitats, claiming that it would harm the Sheep Station's ability to conduct research. SOF ¶ 24. Yet a 2015 independent analysis of Sheep Station research found that, in the prior decade and a half, the Sheep Station published only three papers based on land use in the Centennials, all of which could have been conducted elsewhere. SOF ¶ 40.

The truth is that the Sheep Station is no longer needed for research purposes. Agriculture Secretary Vilsack informed Congress in 2014 of USDA's "plans to close [the Sheep Station] and reprogram the associated funding," explaining that a "productive research program [there] is no longer viable or sustainable," and other locations could continue the Sheep Station's mission. SOF ¶ 41. USDA's 2018 and 2019 budgets also proposed defunding the Sheep Station. *Id.* Yet the FEIS and ROD ignored or downplayed these and other relevant facts.

## ARGUMENT

### I.      STANDARDS OF REVIEW.

Judicial review under the APA requires the Court to hold unlawful and set aside an agency decision that was "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." 5 U.S.C. § 706(2)(A); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005). A decision is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important

aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983). The Court need not defer to an agency's conclusions that are not supported

by the record or run counter to the evidence before it. *W. Watersheds Proj. v. Kraayenbrink*, 632

F.3d 472, 493 (9th Cir. 2011).

## II.      NEPA'S REQUIREMENTS.

NEPA requires federal agencies to take a "hard look" at the environmental consequences

of their proposed actions and alternatives, and disclose them to the public. *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Blue Mountain Biodiversity Project v.*

*Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).

To take this "hard look," federal agencies must prepare an EIS for all "major Federal

actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

The Council on Environmental Quality (CEQ) has promulgated regulations implementing

NEPA, which are binding on all federal agencies. 40 C.F.R. §§ 1500 *et seq.*

The NEPA regulations confirm that the scope of NEPA review is quite broad. The

agency must consider alternatives to the proposed action, and evaluate and disclose its direct,

indirect, and cumulative impacts. *Id*. §§ 1502.16, 1508.7–1508.8. Agencies "shall ensure the

professional integrity, including the scientific integrity," of EISs. *Id*. § 1502.24. "Accurate

scientific analysis, expert agency comments, and public scrutiny are essential to implementing

NEPA." *Id*. § 1500.1(b). An agency must disclose if information is incomplete or unavailable,

and explain "the relevance of the incomplete or unavailable information to evaluating reasonably

foreseeable significant adverse impacts." *Id.* § 1502.22(b)(1). The agency must also directly and explicitly respond to dissenting scientific opinion. *Id.* § 1502.9(b).

For one agency to adopt another agency's prior NEPA analysis, that analysis must provide sufficient and timely details to replace an independent analysis. S*ee* 40 C.F.R. § 1506.3. This means the other agency's NEPA analysis must be thorough and not outdated, publicly available during the adopting agency's comment period, and cited and summarized in the adopting EIS. *Id.*

The Sheep Station has violated these NEPA requirements in numerous ways, as explained below, requiring reversal.

### III.     THE SHEEP STATION VIOLATED NEPA IN REFUSING TO ASSESS DIRECT AND INDIRECT IMPACTS ON NON-ARS ALLOTMENTS.

The first NEPA violation is the Sheep Station's express refusal to analyze direct and indirect impacts of its domestic sheep grazing on the non-ARS allotments, *i.e.*, the Forest Service's Meyers, East Beaver Creek, and Snakey-Kelly Canyons allotments, and DOE's Mud Lake Feedlot. Sheep grazing on these non-ARS allotments was included in FEIS modified alternative 1, which was the "preferred" alternative adopted in the ROD. SOF ¶¶ 2–7. As noted above, the non-ARS allotments form a significant portion of the Sheep Station's grazing program, SOF ¶¶ 4 & 8; and sheep grazing there has been documented to threaten bighorn sheep and grizzly bear, among other species. SOF ¶¶ 14, 17, 20–22.

Yet, remarkably, the FEIS expressly refused to address direct and indirect effects of grazing on the non-ARS allotments, asserting the other agencies had NEPA analyses to authorize grazing on them, and "it is neither required nor appropriate that the Sheep Station revisit these decisions." SOF ¶ 9 (quoting AR 31102). This assertion that NEPA analysis existed for these allotments is demonstrably untrue, SOF ¶ 10–14, and violates NEPA.

Under the NEPA regulations, a federal agency may adopt another agency's EA or EIS if the proposed action is "substantially the same" as that described in the NEPA analysis. 40 C.F.R. § 1506.3(b). But the adopting agency must independently review that analysis and recirculate it for public comment, *id.*, and the adopted NEPA analysis must fully comply with NEPA. 40 C.F.R. § 1506.3(a). The Sheep Station met none of these requirements.

First, the FEIS did not even identify the other NEPA analyses it supposedly relied on to avoid addressing grazing impacts on the non-ARS allotments. SOF ¶ 9. The Sheep Station also never made the other alleged NEPA analyses available for public review and comment as part of its EIS process, in violation of 40 C.F.R. § 1506.3(b).

Second, the only documents mentioned anywhere in the FEIS to support this claim were the 1963 Memorandum of Understanding (MOU) for the Mud Lake Feedlot, and the 2007 Forest Service "categorical exclusion" (CE) for the Meyers Creek allotment—but neither of those documents constitute valid NEPA analysis that the Sheep Station could adopt under the NEPA regulations. SOF ¶¶ 10–12. The 1963 Mud Lake MOU predated NEPA's enactment in 1970, and the only environmental language it contains are two sentences on erosion and weed control. *See* AR 1769–76. The Meyers Creek CE was adopted under Section 339 of the 2005 Consolidated Appropriations Bill, Pub. L. 108-447, which allowed the Forest Service to postpone NEPA analysis in renewing grazing permits; and the CE did not provide analysis of a reasonable range of alternatives, or of direct, indirect and cumulative impacts of the proposed actions. *Id.* Thus, even if the Sheep Station EIS had properly adopted this CE—which it did not—it lacks the "hard look" examination that NEPA and the CEQ regulations require.

Additionally, in response to Plaintiffs' request that the Administrative Record be supplemented with any other NEPA documents that the FEIS relied upon, the Sheep Station

produced a 1996 EA for multiple grazing allotments including East Beaver Creek, and a 1998

EA for the Beaver Creek Drainage Vegetation Management Plan. SOF ¶ 13. Again, the Sheep

Station did not make these EAs available during the EIS process nor take the required steps to

adopt them under the CEQ regulations.

Moreover, these EAs were two decades old at the time the FEIS was issued, yet the

Sheep Station made no effort to analyze whether they remain valid and adequate to justify

relying on them. Even if no obvious changes have occurred, merely relying "on data that is too

stale to carry the weight assigned to it" may render a NEPA analysis inadequate. *N. Plains Res.*

*Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086 (9th Cir. 2011), *citing Lands Council*

*v. Powell,* 395 F.3d 1019, 1031 (9th Cir. 2005). Here, significant changes have occurred since

the Beaver Creek EAs were prepared in the mid-1990s, including substantial new evidence and

science about GYE grizzly population trends and habitat needs, and conflicts with bighorn sheep.

SOF ¶¶ 14, 17, 21–22, 25. Yet the Sheep Station wholly failed to evaluate whether the EAs

remained valid in light of these changed circumstances and significant new information.

Finally, no valid NEPA analysis exists for the Snakey-Kelly Canyons allotments, which

the FEIS proposed to fully graze as the Sheep Station had in the past, but which had no valid

NEPA analysis as Judge Dale noted in issuing the November 2017 injunction. SOF ¶¶ 14–16.

Again, the FEIS and ROD violated NEPA in not addressing sheep grazing impacts there,

including the threats to bighorn sheep that prompted the November 2017 injunction.

In summary, by wholly disregarding direct and indirect effects of sheep grazing on the

Forest Service allotments and Mud Lake Feedlot, based on the demonstrably false assertion they

already had valid NEPA analysis, the Sheep Station violated the CEQ regulations and NEPA's

core commands. An EIS must evaluate and disclose all direct and indirect impacts of a proposed

actions, *Kraayenbrink*, 632 F.3d at 491, and provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences," *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). Here, Sheep Station grazing on the non-ARS allotments poses significant conflicts with wildlife as demonstrated by the record of past closures, which the FEIS and ROD downplayed or ignored. By relying on false assertions about the other agencies' supposed NEPA analyses, the Sheep Station failed to ensure that a hard look was "taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made," and that it included a "discussion of adverse impacts that does not improperly minimize negative side effects." *Kraayenbrink*, 632 F.3d at 491 (citations omitted). Accordingly, the Court must reverse and remand the FEIS and ROD.

## IV.     THE SHEEP STATION FAILED TO TAKE A HARD LOOK AT THE IMPACTS OF GRAZING ON VULNERABLE SPECIES.

Not only was the Sheep Station's analysis of grazing on other agencies' allotments lacking, but it also failed to take a hard look at the impacts of grazing on the vulnerable wildlife species threatened by sheep grazing on its own properties and the non-ARS allotments. The Sheep Station was required to gather and disclose high quality, updated, and accurate information during the NEPA process, and disclose where that information is incomplete. 40 C.F.R. §§ 1500.1(b), 1502.9, 1502.22, 1502.24. An agency violates NEPA when it reports misleading or outdated information in an EIS. *See Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1159–60 (9th Cir. 2006); *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964–66 (9th Cir. 2005) (holding EIS relying on inaccurate and misleading information unlawful for failing to allow a "full and fair discussion of the potential effects"). As discussed below, the Sheep Station FEIS and ROD violated these requirements in multiple ways, again requiring reversal.

A. **The Sheep Station Omitted Crucial Information, Used Unsupported Claims, and Provided Incomplete and Outdated Information to Reach a Predetermined Conclusion.**

Throughout their discussion of the proposed action and environmental consequences, the FEIS and ROD violated NEPA by dismissing facts without evidence, relying on misleading statements, and omitting relevant facts. "[C]onclusory statements, without any supporting data, do not constitute a 'hard look' at the environmental consequences of the action as required by NEPA." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 974 (9th Cir. 2006).

With respect to bighorn sheep, for example, the FEIS claimed that the "preferred alternative" would not endanger bighorn sheep because any bighorn herds were more than twenty miles away, and thus the likelihood of contact with domestic sheep is low. SOF ¶¶ 15–16. The ROD relied on this claim to approve adopting the preferred alternative. *Id.* Yet this assertion is contradicted by Idaho state bighorn mapping, showing that the Lionhead bighorn herd is less than 1.5 miles from the Sheep Station's East Summer Range, less than 3 miles from the Meyers Creek allotment, and less than 9 miles from the West Summer Range. SOF ¶¶ 30-32. Similarly, Judge Dale found that the "straight-line distance between the South Beaverhead population's core herd home range and the [Snakey-Kelly Canyon] allotments is approximately 10 to 12 miles," and that data showed forays by South Beaverhead bighorns into the Snakey-Kelly allotments in the recent past, thus supporting her closure of those allotments to protect the bighorn population. *See W. Watersheds Proj. v. U.S. Forest Serv.*, 2017 WL 5571574, at *6–*8. Yet neither the SIR nor the ROD acknowledged these court findings, which undermine the FEIS' false assertion that Sheep Station grazing under the preferred alternative poses insignificant risks to bighorns.

This bias in presenting information to support the Sheep Station's pre-determined outcome is also seen in the FEIS' analysis of grizzly bear/sheep conflicts. The FEIS stated, for example, that there have been no grizzly/sheep conflicts on Meyers Creek in the past five years, AR 31133, without mentioning that allotment had not been used by the Sheep Station since 2008. AR 1572. The FEIS also used misleading statements and omissions to dismiss the importance of grizzly habitat connectivity in the Centennial Mountains, which, as noted, act as a corridor for GYE bears to mix with other grizzly populations to increase genetic diversity. SOF ¶¶ 33–34. The FEIS cited a plan by U.S. Fish and Wildlife Service (FWS) and the Forest Service to translocate bears by 2020 to address potential genetic transfer issues, AR 31128, but that bear translocation deadline was removed. *See* AR 31130; *Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1014–21 (D. Mont. 2018). In overturning FWS's decision to delist the GYE grizzly bear, *Crow Indian Tribe* confirmed the critical importance of corridors linking GYE grizzlies to other populations, and emphasized the threat posed by "isolation and lack of connectivity between grizzly populations." 343 F. Supp. 3d at 1014. Because the Sheep Station relied on these same rejected rationales in the FEIS and ROD to downplay the Sheep Station's adverse impacts on grizzly bear, it violated NEPA.

Additionally, the staleness of grizzly data is a serious problem throughout the analysis, especially because the grizzly population has been expanding into the Centennials. AR 31124. Yet the Sheep Station relied upon telemetry data that is over a decade old to determine if grizzlies might be present on its lands. AR 31129. The FEIS stated that telemetry has been collected "since 2001" and that only five collared bears have used Sheep Station lands, but failed to disclose that the cited data only goes until 2009. *Id.*; AR 52592. Updated information would

have been accessible to the Sheep Station and should have been provided in this analysis, but the Sheep Station does not appear to have requested grizzly data since 2010. *See* AR 52594.

The Sheep Station also failed to disclose how many grizzlies were actually collared and monitored each year. The information is presented to imply five bears were on Sheep Station land out of the entire GYE population, but the Sheep Station's own map appears to track fewer than twenty bears. AR 28224. A quarter of tracked grizzlies being on Sheep Station lands presents a very different picture than five out of hundreds. Finally, the FEIS acknowledged that 2007 and 2008—the years right before grazing was stopped on the East Summer Range—had a marked increase in grizzly/sheep conflicts. AR 31137. But that increase is presented as an anomalous "peak," when the 2007-2008 data indicate that future bear/sheep conflicts are likely to increase as grizzly bears expand their range.

These and other misleading statements or omissions demonstrate the Sheep Station's failure to comply with NEPA's hard look requirements. Accordingly, the Sheep Station FEIS and ROD are arbitrary, capricious, and not in accordance with NEPA's requirements for failing to take a hard look at the likely impacts on sensitive species.

### B.     The Sheep Station Arbitrarily Claimed Unproven "Best Management Practices" Will Prevent Proven Problems.

The FEIS and ROD further relied on unsupported claims that various "design features," "best management practices," "mitigations," and "conservation measures" (jointly, BMPs) would protect bighorn sheep, grizzly bears, and sage-grouse from adverse impacts from Sheep Station grazing. *See* AR 31060–66 (FEIS), 37018–20 (ROD). These include herding, "good husbandry," and other measures to prevent contact between the domestic sheep and bighorns or grizzlies, as well as limiting sheep grazing in sage-grouse priority habitats and installing reflectors on fences

to deter sage-grouse collisions. *Id.* But the Sheep Station failed to present any evidence that its BMPs have been proven effective or are even supported by empirical evidence.

Regarding bighorn sheep, for example, Judge Dale found that BMPs such as those used by the Sheep Station are not proven effective in preventing contact and deadly disease transmission between bighorn and domestic sheep. *See W. Watersheds Proj.*, 2017 WL 5571574, at *8–9 & *13 n.25. "Even with flawless execution of BMPs, there is no way the Sheep Station ... can ensure that domestic sheep will not wander, and that … rams will not make forays on or near the allotments while the large herds of domestic sheep are grazing." *Id.* at *13. That mirrors prior findings that BMPs very similar to the Sheep Station's are inadequate to separate bighorn and domestic sheep. *See, e.g., Idaho Wool Growers Ass'n v. Vilsack,* 7 F. Supp. 3d 1085 (D. Idaho 2014), *aff'd* 816 F.3d 1095 (9th Cir. 2016); *W. Watersheds Proj. v. BLM,* No. 4:09-cv-507-BLW, 2009 WL 3335365 (D. Idaho Oct. 14, 2009); AR 1528. Yet the FEIS and ROD simply assert BMPs will prevent diseases from spreading to bighorns, without any acknowledgement of these prior findings or the science underlying them, nor the lack of science supporting the use of these BMPs.

These cases are also directly applicable to the BMPs for avoiding domestic sheep/grizzly conflicts because they show that it is difficult to perfectly monitor domestic sheep grazing on public lands, as evidenced by the numerous sheep that the Sheep Station has lost. SOF ¶ 29.

The FEIS also ignored the fact that its sage-grouse BMPs—such as attaching reflectors to fences to reduce sage-grouse collisions—only address part of the problem, since fences provide raptor perches and encourage weed invasions, causing increased predation and habitat abandonment that are caused by fence fragmentation impacts. SOF ¶ 38. The FEIS analysis is further undermined by the fact that the July 2018 "Errata" to the FEIS (ROD, Appendix C),

eliminated a major sage-grouse BMP that limited sheep grazing on the Headquarters ranch to avoid leks, nesting areas, and early brood-rearing areas. SOF ¶ 39.

Thus, similar to the Snakey-Kelly and other decisions of this Court cited above, the FEIS and ROD here fail to demonstrate that the asserted BMPs will reduce or avoid adverse impacts of Sheep Station grazing upon vulnerable wildlife species, again violating the NEPA "hard look" requirements and warranting reversal and remand.

### V.   THE SHEEP STATION VIOLATED NEPA BY MISSTATING AND EXAGGERATING THE EFFECTS OF THE DISCARDED ALTERNATIVES.

Finally, the Court should also reverse and remand the FEIS and ROD because the Sheep Station used misstatements and exaggerations about its research needs and value to reject all alternatives that would have ended or reduced Sheep Station grazing to protect wildlife, including bighorn sheep, grizzly bear, and sage-grouse. "As the EIS is intended to be used to guide decision-making, the alternatives analysis is naturally the 'heart of the environmental impact statement.'" *Oregon Natural Desert Ass'n v. BLM*, 625 F.3d 1092, 1100 (9th Cir. 2010) (*quoting* 40 C.F.R. § 1502.14). This means the EIS must "rigorously explore and objectively evaluate all reasonable alternatives." *Id*. The Sheep Station failed that test.

The FEIS identified alternatives to the proposed action (modified alternative 1) as including elimination of all Sheep Station grazing (alternative 2) and ending grazing in various non-ARS allotments and the East and West Summer Ranges (modified alternatives 3 to 5). *See* AR 31073–86. But the FEIS asserted that any of the alternatives to reduce or eliminate Sheep Station grazing across the ARS and non-ARS lands would interfere with its research mission, particularly impairing its ability to utilize the diversity of habitats available on the different Sheep Station grazing lands to conduct genetics and management research. AR 31088–99. The

ROD followed the FEIS in approving modified alternative 1 as "necessary to achieve the mission of the station" and "support rangeland and sheep research to increase the efficiency of sheep and improve the sustainability of rangeland ecosystems." AR 37018.

Contradicting these assertions, a 2015 independent analysis by Dunrovin Ranch and Research reviewed 144 publications issued by the Sheep Station during 2000-2015, to determine "how much of the research activity . . . required the use of primarily high elevation pastures" where there were conflicts with wildlife. SOF ¶ 39; AR 52893–900. It found "only 3 of the publications were based on work conducted in the wildlife conflict pastures and all of them could have been conducted at other sites" outside of Sheep Station lands. AR 52895. In other words, all of the Sheep Station research during that period was broadly applicable and did not require grazing in the Centennial allotments. Yet the FEIS and ROD never acknowledged this.

Moreover, the FEIS and ROD failed to acknowledge that allotment closures over the course of this NEPA process have not produced the predicted adverse impacts on the Sheep Station's research activities. For example, proposed modified alternative 5 would have ended Sheep Station grazing in the Snakey-Kelly Canyons allotments and supposedly required reducing the herd by 40%, while proposed modified alternative 3 would have ended grazing on the East and West Summer Ranges and Humphrey Ranch east of Beaver Creek, as well as on the East Beaver and Meyers Creek allotments, and supposedly required reducing the herd by 50%. AR 31087. The FEIS claimed that both alternatives would limit the Sheep Station's research potential. AR 31089. However, over the course of the last decade, the Sheep Station has lost access to each of these areas for periods of time but has nevertheless continued to maintain a herd within or above its ideal size. SOF ¶¶ 25–26. Meanwhile, the Sheep Station has blamed decreases in herd size on "financial challenges," not the closure of specific allotments. *Id.*

Further demonstrating the misleading nature of this justification, the Sheep Station determined in the SIR that the inability to graze on Snakey-Kelly would not substantially affect the proposed action, and thus did not require supplemental NEPA analysis, even though the FEIS claimed its loss would seriously impede the Sheep Station's mission. SOF ¶ 16; AR 31091.

Further demonstrating the FEIS and ROD vastly overstated the supposed importance of Sheep Station research is the 2014 announcement by Secretary of Agriculture Vilsack, who informed Congress of USDA's "plans to close [the Sheep Station] and reprogram the associated funding," explaining that a "productive research program [there] is no longer viable or sustainable," and other research locations could continue the Sheep Station's mission. SOF ¶ 40; AR 30687. The fiscal year 2018 and 2019 USDA budgets continued to recommend closing the Sheep Station. SOF ¶ 40. Yet again, the FEIS and ROD did not candidly acknowledge these facts even when choosing to continue Sheep Station grazing activities despite their conflicts with vulnerable wildlife like bighorn sheep, grizzly bears, and sage-grouse.

In truth, the Sheep Station is beyond its useful life as a federal research institute for the domestic sheep industry, and its costs to the federal taxpayers can no longer be justified, particularly in light of the impacts that Sheep Station activities and facilities have on sensitive wildlife. In failing to acknowledge this reality, or explore reasonable alternatives reflecting it, the FEIS and ROD again violated NEPA and the APA.

## **CONCLUSION**

For the foregoing reasons, the Plaintiffs respectfully request that the Court grant their motion for summary judgment and reverse and remand the EIS and ROD.

DATED:  December 23, 2019              Respectfully submitted,

*/s/ Laird J. Lucas*
Laurence ("Laird") J. Lucas (ISB # 4733)

Bryan Hurlbutt (ISB # 8501)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
llucas@advocateswest.org
bhurlbutt@advocateswest.org
gtodd@advocateswest.org

*Attorneys for Plaintiffs*