Laurence ("Laird") J. Lucas (ISB # 4733)
Bryan Hurlbutt (ISB # 8501)
Garrison Todd (ISB # 10870)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
llucas@advocateswest.org
bhurlbutt@advocateswest.org
gtodd@advocateswest.org

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, WILDEARTH GUARDIANS, and CENTER FOR BIOLOGICAL DIVERSITY, <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. SHEEP EXPERIMENT STATION, and USDA AGRICULTURAL RESEARCH SERVICE, <br><br> *Defendants*. | No. 01:19-cv-065-REB <br><br> **PLAINTIFFS' COMBINED RESPONSE/REPLY BRIEF ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 20, 23 & 26)** |

## INTRODUCTION

Defendant U.S. Sheep Experiment Station (Sheep Station) and Intervenor American Sheep Industry (ASI) argue the Court should reject Plaintiffs' NEPA challenges as improper policy disagreements with "congressional priorities," and "mere fly-specking" of the July 2017 Final Environmental Impact Statement (FEIS) and July 2018 Record of Decision (ROD). *See* ECF Nos. 23 & 26. Such rhetorical attacks do not defeat Plaintiffs' showing that the FEIS and ROD have fatal defects in violation of NEPA and the APA.

The Sheep Station reiterates the FEIS's statement that other agency NEPA documents evaluated and authorized Sheep Station grazing on the non-Agricultural Research Service (ARS) lands, and argues "the Sheep Station's actions on non-ARS properties do not 'trigger' NEPA." *See* Def. Br. (ECF No. 23) at 8, 10–11.[1] That is wrong factually and legally. There are no other valid NEPA analyses for the non-ARS lands, and the Sheep Station's grazing on both ARS and non-ARS lands is the "proposed action" it approved based on the FEIS and ROD, which Plaintiffs properly challenge in this case.

Equally misplaced is the Sheep Station's contention that claims relating to the Snakey-Kelly allotments are "moot" because those allotments were closed to grazing on an interim basis after the FEIS was issued. The July 2018 Supplemental Information Report (SIR) and ROD provide that "grazing will resume as described under alternative 1 of the FEIS" once the Snakey-Kelly allotments "become available." Because the Sheep Station has not irreversibly given up on grazing Snakey-Kelly under the terms of the FEIS and ROD, it fails to carry its heavy burden of showing mootness.

---

[1] Because ASI simply reiterates the legal arguments made by the Sheep Station, *see* ECF No. 26-1, at 7-15, Plaintiffs only cite the Sheep Station's arguments throughout this brief.

Moreover, the Sheep Station's consideration of alternatives in the FEIS and ROD was fundamentally misleading by portraying the proposed action—modified Alternative 1—as "continuing historic and ongoing grazing," when in fact the East and West Summer Ranges and Meyers Creek allotments had <u>not</u> been used for a decade. Yet the FEIS and ROD rejected all alternatives to close any allotments by asserting it would unreasonably interfere with the Sheep Station's research mission. The SIR and ROD never re-evaluated that position after the Snakey-Kelly allotments were closed. Their closure thus underscores Plaintiffs' claims that the Sheep Station failed to give adequate consideration to any alternatives other than its pre-determined action, for which the Court can order effective relief by remanding for a new EIS and ROD.

These and other NEPA defects shown by Plaintiffs are not "mere fly-specking." The Sheep Station purports to approve its "historic and ongoing grazing" into the indefinite future when in reality its grazing has been increasingly limited by wildlife conflicts, which it downplayed while exaggerating the importance of its "research." The time is long past for the Sheep Station to candidly evaluate the present reality of its grazing and accurately assess alternatives and impacts, as required by NEPA. The Court should thus grant summary judgment for Plaintiffs, and reverse and remand the FEIS, SIR, and ROD.

## ARGUMENT

### I.   THE SHEEP STATION'S REFUSAL TO EVALUATE DIRECT AND INDIRECT IMPACTS ON NON-ARS LANDS VIOLATES NEPA.

Plaintiffs have shown that the FEIS failed to address direct and indirect impacts of Sheep Station grazing on non-ARS lands, including the Forest Service allotments and DOE's Mud Lake Feedlot. *See* Plfs. Separate Statement of Facts (SOF) (ECF No. 20-2), ¶¶ 9–14; Plfs. Br. (ECF No. 20-1), at 6–7, 9–12. Again, the FEIS expressly stated that it "analyze[d] the direct/indirect effects of the proposed actions <u>on ARS properties only</u>," because "<u>[s]eparate NEPA analyses

were prepared and decisions were made by the respective agencies to authorize sheep grazing on the lands they administer" and "[i]t is neither required nor appropriate that the Sheep Station revisit these decisions." AR 31102 (emphases added).

The Sheep Station's Response SOF (ECF No. 23-1) quotes another passage of the FEIS, which similarly stated that "our use of these allotments is covered under separate agreements with those agencies; which dictate when and how many animals we can graze; and are covered separately by the appropriate National Environmental Policy Act documents." Def. SOF at 3 (quoting AR 31028) (emphasis added). Thus, it is undisputed that the FEIS refused to address direct or indirect effects of Sheep Station grazing on the non-ARS lands, violating NEPA.

### A.    The Sheep Station Cannot Avoid NEPA's Duty to Fully Evaluate Direct and Indirect Effects of its Grazing on Non-ARS Lands.

The Sheep Station argues that its "actions on non-ARS properties do not 'trigger' NEPA," because it "cannot utilize the non-ARS lands without authorization from the appropriate agency," and Plaintiffs instead have to challenge the other agencies' alleged NEPA documents. *See* Def. Br. at 10–11, *citing San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 644 (9th Cir. 2014). The Court must reject this erroneous argument.

First, the Sheep Station ignores the fact that the "proposed action" studied in the FEIS is "to continue historical and ongoing grazing and associated activities" on both the ARS and non-ARS lands. AR 31011. *See also* AR 31028 ("This project is being proposed by the [Sheep Station] . . . to continue sheep grazing and associated activities currently occurring on Sheep Station properties; U.S. Department of Agriculture, Forest Service allotments; and a feedlot on Department of Energy (DOE) land (proposed action)"). Having defined the "proposed action" as Sheep Station grazing on ARS and non-ARS lands, the Sheep Station cannot now exempt itself from its NEPA duty to provide "a reasonably thorough discussion of the significant aspects of

the probable environmental consequences" of that proposed action, *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982), including all direct, indirect, and cumulative effects. *W. Watersheds Proj. v. Kraayenbrink*, 632 F.3d 472, 491–93 (9th Cir. 2011). *See also* 40 C.F.R. § 1508.8 (defining direct and indirect effects).

Moreover, the Sheep Station's argument that it has no duty to evaluate effects of its proposed action on lands outside its own jurisdiction is wrong as a matter of law. *See S. Fork Band Council of W. Shoshone of Nevada v. U.S. Dept. of Interior*, 588 F.3d 718, 725–26 (9th Cir. 2009) (reversing approval of mine on BLM lands that did not address effects of transporting ore to off-site processing facility); *City of Davis v. Coleman*, 521 F.2d 661, 676 (9th Cir. 1975) (reversing agency's refusal to assess effects of highway interchange in spurring development on private and state lands); *Colorado River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1433 (C.D. Cal. 1985) (rejecting decision to assess only impacts within agency's jurisdiction, holding it "should have analyzed the indirect effects . . . on both 'on site' and 'off site' locations"); *see also* 40 C.F.R. 1502.14(c) (requiring NEPA analysis to "include reasonable alternatives not within the jurisdiction of the lead agency").

The Sheep Station's reliance on *San Luis* to evade these NEPA requirements is misplaced. The Ninth Circuit there reversed a ruling that the Fish and Wildlife Service (FWS) violated the Endangered Species Act (ESA) in issuing a Biological Opinion (BiOp) limiting Bureau of Reclamation operation of the Central Valley Project to reduce impacts on the threatened San Francisco Bay delta smelt. *See San Luis*, 747 F.3d at 581–638. The Ninth Circuit affirmed, however, that FWS did not have to prepare an EIS along with the BiOp, while Reclamation did have to prepare an EIS. *Id.* at 641–55. It held that the BiOp did not constitute a "major federal action" under NEPA since it is advisory, but that Reclamation had to prepare an

EIS in determining whether to adopt the BiOp, since Reclamation's decisions would have on-

the-ground impacts. *Id.* As *San Luis* further explained:

> Here, there is no comparable need to require the FWS to prepare an EIS because Reclamation stands ready to do so. . . . We see no reason to require a consulting agency like the FWS to complete an EIS when an action agency like Reclamation will either (1) prepare an EIS when it implements FWS's proposal or (2) reject FWS's proposal and prepare an EIS on whatever alternative it implements.

*Id.* at 644. *San Luis* thus holds diametrically opposite of the Sheep Station's reading. Because the

Sheep Station here is the "action agency" that will cause on-the-ground impacts by its proposal

to graze on ARS and non-ARS lands, *San Luis* confirms that the Sheep Station has the NEPA

duty to fully assess potential impacts. Moreover, no other agency "stands ready" to conduct

NEPA analysis of the Sheep Station's grazing, including on non-ARS lands—the Sheep Station

is proposing the action, and prepared the FEIS. Nothing in NEPA or *San Luis* allows the Sheep

Station to unilaterally exempt itself from the duty to evaluate all direct and indirect effects of its

proposed action, including of its grazing on non-ARS lands.

## B.   There Are No Other Adequate NEPA Analyses for the Non-ARS Lands.

As a factual matter, the FEIS also wrongly claimed that the Forest Service and DOE

conducted adequate NEPA analysis to assess the Sheep Station's proposed action of continuing

"historic and ongoing" grazing on the non-ARS properties. *See* Plfs' SOF ¶¶ 10–13. Because this

is untrue, the Sheep Station cannot validly contend that Plaintiffs' only remedy is to challenge

those other alleged NEPA documents, instead of the FEIS. *See* Def. Br. at 10–11.

First, regarding the DOE Mud Lake Feedlot, the Sheep Station now admits that the FEIS

"was partially incorrect" and there was no prior NEPA analysis. *See* Def. Br. at 8, n.4. But it

suggests this was "harmless error" because it "did not preclude informed decision-making and

public participation or otherwise materially affect the substance of the agency's decision." *Id.*,

quoting *Ground Zero Ctr. v. U.S. Dep't of Navy,* 860 F.3d 1244, 1252 (9th Cir. 2017).

The FEIS's admitted error here was not "harmless." The Mud Lake Feedlot is located in

priority sage-grouse habitat, where grazing and fencing pose adverse direct and indirect impacts,

including degrading and fragmenting sage-grouse habitat, promoting predation and habitat

abandonment, and creating collision risks. *See* Plfs. SOF ¶¶ 37–38; AR 31164, 31171–72. The

FEIS never evaluated such potential impacts for the Mud Lake Feedlot at all. *See* AR 31165–73.

As numerous cases have confirmed, failure to evaluate potential impacts on sage-grouse

and their habitat is a significant NEPA violation that is not "harmless" error. *See, e.g., ONDA v.

Jewell*, 840 F.3d 562, 568–70 (9th Cir. 2016) (reversing wind project EIS for wrongly assuming

sage-grouse winter habitat was not present in project area, finding the "inaccurate information

and unsupported assumption materially impeded informed decisionmaking and public

participation"); *N. Plains Res. Council v. Surface Transp. Bd.,* 668 F.3d 1067, 1084–85 (9th Cir.

2011) (failure to gather baseline data and assess impacts of railway line on sage-grouse violated

NEPA, because the "EIS process cannot serve its larger informational role, and the public is

deprived of their opportunity to play a role in the decision-making process"); *W. Watersheds

Proj. v. Schneider,* 417 F.Supp.3d 1319, 1332–35 (D. Idaho 2019) (enjoining BLM land use

plans that reduced sage-grouse habitat protections, based on NEPA violations that threaten

irreparable harm to public); *W. Watersheds Proj. v. Salazar*, 843 F.Supp.2d 1105, 1125–28 (D.

Idaho 2012) ("Given the importance of the Great Basin sage grouse population, and the wide-

spread destruction of its habitat and reduction in populations, it was particularly important for the

EA to discuss the scope of their cumulative impact analysis"). Similarly here, because the FEIS

avoided addressing direct or indirect effects of Sheep Station use of the Mud Lake Feedlot,

neither the Court nor the public are informed about how continued use of the Mud Lake Feedlot

might directly and indirectly impact sage-grouse and their priority habitats, confirming the FEIS

error was not "harmless."

Second, regarding the Forest Service allotments, the Sheep Station does not dispute that

the FEIS never identified the prior NEPA analyses that it supposedly relied upon, much less

reviewed them for adequacy and recirculated them for public comment, as required by 40 C.F.R.

§ 1506.3(b). *See* Def. Br. at 10, n.6 ("Sheep Station does not contend that it adopted the

environmental analyses of other agencies" under 40 C.F.R. § 1506.3). Neither does the Sheep

Station refute Plaintiffs' factual showing that the only NEPA analyses for any of the Forest

Service allotments are the 1996 and 1998 EAs for East Beaver Creek, plus the 2007 "categorical

exclusion" (CE) for Meyers Creek. *See* Plfs. SOF ¶¶ 10–14; Def. SOF ¶¶ 10–14. The Sheep

Station merely disputes Plaintiffs' characterization that the 2007 Meyers Creek CE did not

constitute valid NEPA compliance, saying that "[a]pplication of a [CE] is a method of

complying" with NEPA. Def. SOF ¶ 12, citing *Alaska Ctr. for Env't v. U.S. Forest Serv.,* 189

F.3d 851, 853–54 (9th Cir. 1999).

While a CE may be a "method of complying" with NEPA in appropriate circumstances,

the facts remain that the Meyers Creek CE was issued more than a decade ago to <u>postpone</u> the

Forest Service's analysis of grazing impacts and alternatives, under Section 339 of the 2005

Consolidated Appropriations Bill, Pub. L. 108-447; and that 7-page CE did not provide any

"hard look" at direct, indirect, and cumulative impacts or a reasonable range of alternatives. *See*

Plfs. SOF ¶12; AR 31433. It is also now badly outdated, since Meyers Creek was not grazed for

the last decade, *see* Plfs. SOF ¶ 20. The Sheep Station does not even try to defend the adequacy

of the 1996 and 1998 EAs for Beaver Creek, which are decades old and outdated and limited in

their discussion of grazing impacts. *See* Plfs. SOF ¶13. Thus, neither the Meyers Creek CE nor the older EAs meet the NEPA requirements of taking an up-to-date "hard look" at the direct and indirect effects of Sheep Station grazing into the future, and do not excuse the Sheep Station's refusal to assess such impacts in the FEIS here.

### C.   The FEIS's Discussion of Non-ARS Properties Does Not Rectify Its Refusal To Evaluate Direct and Indirect Effects There.

Implicitly acknowledging Plaintiffs' point, the Sheep Station also argues that the FEIS "contains an extensive discussion of potential effects on non-ARS lands," pointing to discussion of Meyers Creek in the FEIS section on grizzly bear and Canada lynx; the discussion of bighorn sheep impacts on Snakey-Kelly; and the FEIS cumulative effects sections. *See* Def. Br. at 9. It further asserts that "Plaintiffs fail to identify *any potential effects* on non-ARS lands that were not disclosed in the FEIS." *Id.* (emphasis in Sheep Station brief).

In truth, Plaintiffs have repeatedly alerted the Sheep Station to direct and indirect impacts of its grazing and related activities on the non-ARS lands, which were never candidly and fully assessed in the FEIS. *See* AR 20864, 32349, 32411, 35237, 38298. These include providing science and studies on potential impacts to grizzly bear, bighorn sheep, and sage-grouse which the Sheep Station ignored or brushed off in the FEIS. *Id.*

The FEIS's discussion in the grizzly bear section is also demonstrably inadequate under NEPA to assess direct and indirect effects of Sheep Station grazing on the Meyers Creek allotment. Under the proposed action (modified Alternative 1), Meyers Creek would be used for trailing sheep to and from the East Summer Range pasture. *See* AR 31748–52, 31079–81. The FEIS discussed the ESA listing history and status of the Greater Yellowstone Ecosystem (GYE) grizzly bear, and identified management practices the Sheep Station will follow to minimize potential sheep/grizzly bear conflicts. *See* AR 31123–42. For the effects of modified Alternative

1 on grizzly bear, the FEIS repeatedly stated there "have been very few grizzly bear/sheep encounters pertaining to Sheep Station grazing activities over the last 10 years despite the known presence of grizzly bears occupying the habitat," and "[i]n the past five years, there have been no reported grizzly bear/livestock conflicts on the Forest Service Meyers Creek Allotment." *See* AR 31133–36. The FEIS further stated that the "Sheep Station had a total of five grizzly bear/sheep interactions over a two year period (2007 and 2008) which represents a period where they had more grizzly bear interactions than typical," and it projected future grizzly/sheep interactions under the proposed action at "three encounters per year," because it said that the encounters "peaked in 2007 and 2008." AR 31137. It concluded that adverse effects of grazing under modified Alternative 1 in terms of encounters "may or may not occur," and are "small in comparison to estimated population size" of the GYE grizzly. AR 31137–38.

But the truth is that Meyers Creek and the East Summer Range allotments were not grazed by the Sheep Station from 2009 until the FEIS was prepared. *See* Plfs. SOF ¶¶ 20–21, 25; Def. SOF ¶¶ 20–21, 25 (undisputed). The FEIS is fundamentally misleading, first, in asserting that modified Alternative 1 simply "continues" the Sheep Station's "historic and ongoing" grazing, including on Meyers Creek and East Summer Range, when those allotments had not been grazed for a decade before; and, second, in minimizing the likelihood of future grizzly/sheep conflicts by asserting that there have been "few" encounters in the last ten years and that 2007-2008 represent a "peak" in conflicts, when grazing has not occurred in the last decade. Using a false or misleading "baseline" of no grazing during the last decade to claim there will be no or minimum impacts from re-opening Meyers Creek and East Summer Range to Sheep Station grazing violates NEPA. *See ONDA v. Jewell*, 840 F.3d at 568–70; *N. Plains Res. Council,* 668 F.3d at 1084–85.

Moreover, the FEIS wholly failed to address the larger impacts on GYE grizzly bear of re-opening Meyers Creek and East Summer Range to Sheep Station grazing under modified Alternative 1. As stated in the 2017 GYE grizzly annual report (AR 37262), <u>all</u> Forest Service sheep allotments in the GYE grizzly bear Primary Conservation Area (PCA) have been retired in the last two decades, <u>except</u> Meyers Creek. AR 37379. This is significant, because the GYE grizzly bear conservation strategy seeks "to preserve adequate secure habitat for grizzly bears and reduce negative impacts of human presence" from "motorized access, human development, and commercial livestock grazing." AR 37375. To implement that strategy, "[d]omestic sheep allotments on public lands inside the PCA have largely been phased out since 1998," with a "98% net reduction in the area grazed by sheep on public lands." AR 37379. "Today, only 1 sheep allotment remains active on public land inside the PCA: the Meyers Creek allotment," but even it "has consistently been issued a no-use permit since 2008. Consequently, there has been no domestic sheep grazing on public lands inside the PCA for the past ten years." *Id.*

The FEIS and ROD utterly fail to address the reality of what the Sheep Station has approved in selecting modified Alternative 1: resuming sheep grazing on the Forest Service's Meyers Creek allotment, which allows resumed Sheep Station grazing on the East Summer Range as well, will <u>reduce</u> the existing protections for GYE grizzly bear within the PCA, set back progress made under the conservation strategy, and risk far more human/grizzly and sheep/grizzly encounters than occurred in the last decade, when they were closed. In misstating the nature of the approved action, and failing to acknowledge how re-opening Meyers Creek and East Summery Range will undercut the conservation strategy of  eliminating public lands sheep grazing in grizzly bear habitat, the FEIS certainly did not provide an adequate "hard look" at these direct and indirect impacts relating to the Meyers Creek allotment. *See Native Ecosystems*

*Council v. U.S. Forest Serv.*, 418 F.3d 953, 964–66 (9th Cir. 2005) (finding NEPA violations where agency used inaccurate and misleading information to avoid a "full and fair discussion of the potential effects").

The FEIS's discussion of cumulative effects likewise does not make up for its refusal to assess direct and indirect impacts on the non-ARS lands. The FEIS treated cumulative effects at larger geographic scales—the GYE for grizzly bear, Upper Snake River region in Idaho and the Centennials in Montana for bighorn sheep, and IDFG's Upper Snake River Sage Grouse Planning Area for sage-grouse. *See* AR 31139–40, 31159, 31173. Each of these cumulative effects analyses in the FEIS is cursory and general, and repeats the Sheep Station's position that no adverse cumulative effects are expected from any of its activities. *Id.*

For sage-grouse, the FEIS's half-page cumulative effects section merely asserted that the Sheep Station is "involved in addressing the management strategies and practices that enhance and conserve rangeland ecosystems under changing environmental conditions," and stated that Idaho Power is "currently upgrading its existing transmission lines through the Headquarters Property" and "no new road construction is planned." AR 31173. The FEIS thus did not address cumulative effects to sage-grouse on the non-ARS properties as required by NEPA, such as by identifying other grazing and fencing in and around the Sheep Station allotments or evaluating how Sheep Station grazing on both ARS and non-ARS properties could contribute to habitat degradation, fragmentation, and abandonment. *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971–74 (9th Cir. 2006) (cumulative effects analysis requires a "quantified assessment" and "objective quantification of the impacts" from other existing and proposed projects); *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998) ("quantified or detailed information is required" to take a hard look at cumulative impacts).

In summary, the record before the Court belies the FEIS's false claim that other agencies prepared "separate analyses" that adequately evaluated Sheep Station grazing on non-ARS lands. Indeed, that false assertion about such other NEPA analyses itself violates NEPA, requiring reversal by this Court. *See Native Ecosystems*, 418 F.3d at 964–66 (reversing for agency false or misleading statements).

## II.   PLAINTIFFS' CHALLENGES REGARDING THE SNAKEY-KELLY ALLOTMENTS ARE NOT MOOT, AND UNDERSCORE THAT THE FEIS, SIR, AND ROD ARE ARBITRARY AND CAPRICIOUS.

### A.   The Sheep Station Has Not Carried Its Heavy Burden of Showing Mootness.

The Forest Service's Snakey-Kelly allotments were historically a significant part of the Sheep Station's grazing, and were included within the FEIS's "proposed action" (modified Alternative 1) to "continue historic and ongoing" grazing there. *See* Plfs. SOF ¶¶ 5–8; AR 31012, 31051, 31079-80. The FEIS considered an alternative to close the Snakey-Kelly allotments (modified Alternative 5), but rejected that alternative because it would reduce the Sheep Station's herd by 40% and have a "major impact" on its research program, which it said was unacceptable. Plfs. SOF ¶ 16; AR 37013–23.

Just months after the FEIS was issued in July 2017, Magistrate Judge Dale issued an injunction closing the Snakey-Kelly allotments to Sheep Station grazing that winter because of threats posed to bighorn sheep. *W. Watersheds Proj. v. U.S. Forest Serv.*, No. 1:17-CV-434-CWD, 2017 WL 5571574 (D. Idaho Nov. 20, 2017). In June 2018, the Forest Service agreed to a settlement closing them indefinitely until it performs new NEPA analysis. *Id.*, ECF No. 44-1.

In the July 2018 SIR, the Sheep Station did not even mention Judge Dale's ruling, only the Forest Service decision not to graze Snakey-Kelly until new NEPA is done. *See* AR 37008. Yet the SIR stated that "[i]f and when the Forest Service Snakey-Kelly allotments become

available, grazing will resume as described under alternative 1 of the FEIS." AR 37012
(emphasis added). The ROD similarly stated that grazing on Snakey-Kelly "will not be utilized
(i.e., no sheep grazing will occur) until the Forest Service authorizes use for grazing." AR 37018
(emphasis added). Remarkably, the Sheep Station's brief ignores these SIR and ROD statements
in arguing that Plaintiffs' claims over Snakey-Kelly are supposedly "moot." *See* Def. Br. at 8–9.

A claim is moot if it "has lost its character as a live controversy," and whether "a live
controversy exists depends on whether we can grant effective relief." *Indep. Living Ctr. of S.
Cal. v. Maxwell-Jolly,* 590 F.3d 725, 727 (9th Cir. 2009) (quotation omitted). The "party
asserting mootness bears a 'heavy' burden; a case is not moot if *any* effective relief may be
granted." *Karuk Tribe of Cal. v. U.S. Forest Serv.,* 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc)
(emphasis in original). Even where an action may be mostly completed, a NEPA claim is not
moot if a court can grant "any effective relief for the alleged harm," including remand for further
NEPA analysis of possible mitigation or other measures. *Neighbors of Cuddy Mountain v.
Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002) (citing *Cantrell v. City of Long Beach*, 241 F.3d
674, 678 (9th Cir. 2001)).

Here, the Sheep Station is relying on the FEIS and ROD to authorize its sheep grazing on
all ARS and non-ARS allotments, including Snakey-Kelly, into the indefinite future. The Forest
Service's interim closure of Snakey-Kelly has not changed that authorization, as the SIR and
ROD expressly state. By ignoring its own decision documents that approve sheep grazing on the
Snakey-Kelly allotments once the Forest Service may reopen them, the Sheep Station has failed
to carry its heavy burden to demonstrate mootness.

Moreover, based on the NEPA violations shown by Plaintiffs, the Court can provide
Plaintiffs with effective relief over the FEIS's NEPA violations, including its inadequate

treatment of alternatives and impacts of grazing on Snakey-Kelly. The proper remedy for the NEPA violations is a remand for the Sheep Station to prepare an updated and accurate NEPA analysis of its future grazing plans. And upon remand, the Sheep Station must candidly reassess its prior conclusion that closing the Snakey-Kelly allotments is unacceptable because of impacts on the Sheep Station's research, and consider a full range of alternatives that do not misleadingly weight the scale in favor of resuming "historic" grazing on ARS and non-ARS lands.

### B.  The SIR Did Not Take The "Hard Look" NEPA Requires.

Moreover, the SIR—which the Sheep Station relied upon in concluding that the FEIS was adequate and in approving the ROD, despite the Snakey-Kelly closure—is itself arbitrary and capricious and violates NEPA's "hard look" requirement, further confirming that the Court may grant relief to Plaintiffs in reversing the FEIS, SIR, and ROD and remanding for full NEPA compliance. *See* First Amended Complaint (ECF No. 3), ¶¶ 109–114 & Prayer for Relief ¶¶ b–c (challenging SIR, and requesting reversal and remand of FEIS, SIR, and ROD).

An agency must prepare a supplemental NEPA analysis if there remains a major federal action to occur and new information shows that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered. 40 C.F.R. § 1502.9(c)(ii); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). The agency must take a "hard look" at the new information to assess whether NEPA supplementation is necessary. *Id*. It must "be alert to new information that may alter the results of its original environmental analysis, and 'continue to take a hard look at the environmental effects of [its] planned action, even after a proposal has received initial approval'." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557–58 (9th Cir. 2000) (quoting *Marsh*, 490 U.S. at 374).

In determining whether supplemental NEPA analysis is required, an agency may conduct an internal evaluation of the new information, such as the July 2018 SIR that the Sheep Station prepared here. *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008). But such evaluation still must take a "hard look" at the new information to determine whether supplemental NEPA is necessary, and make a reasoned decision based on its evaluation of the significance or lack of significance of the new information. *Friends of the Clearwater,* 222 F.3d at 557.

Here, the Sheep Station's SIR failed to take the required "hard look" or provide a "reasoned decision" in assessing the Snakey-Kelly closure and how it affected the FEIS's analysis of impacts and alternatives. *See* AR 377008-12. As noted above, the SIR failed even to mention Judge Dale's injunction order or its reasoning—which found that risks of disease transmission from domestic sheep to the South Beaverhead bighorn sheep herd were far greater than the Forest Service and Sheep Station had admitted. *See W. Watersheds Proj., supra,* 2017 WL 5571574 at *11–14. Yet the FEIS made the same faulty assertions about the South Beaverhead herd supposedly being too distant from Sheep Station sheep grazing, and about the supposed effectiveness of "best management practices" in reducing risks of disease transmission to the bighorn, that Judge Dale rejected. *See* AR 31062–63, 31157–59.

Specifically, the FEIS asserted that bighorn herds "are known to occupy the west side of the Beaverhead Mountains in the winter months, while the Sheep Station grazes domestic sheep on the east side of the Beaverheads (Snakey-Kelly Allotments) November through January." AR 31157.  While the FEIS noted "this suggests potential for contact between wild and domestic sheep . . . [which] could result in negative effects to the Beaverhead herds if the contact resulted in disease transmission," it nevertheless concluded that "[m]easures are in place to minimize

contacts" and "minimize this risk." AR 31157–58. It also asserted that cumulative effects of its

sheep grazing would be insignificant, and "bighorn populations are expected to continue in their

current condition and trend, regardless of which alternative is selected." AR 31159.Yet the SIR

mentioned none of these aspects of the FEIS, which were revealed to be false or at least highly

questionable following Judge Dale's ruling and the Forest Service's interim closure of the

Snakey-Kelly allotments. *See* AR 377008-12. The SIR thus failed the "reasoned decision" test.

Neither did the SIR reexamine the FEIS's assertions that closing Snakey-Kelly would

require a major herd reduction and pose unacceptable impacts to Sheep Station research. The

SIR simply stated that, while the Snakey-Kelly allotments remain closed, the Sheep Station's

"flock inventory will be reduced from the targeted 3,000 mature sheep but remain within the

range that is necessary to accomplish research objectives," an unspecified "proportion of the

sheep that would normally be scheduled to graze Snakey-Kelly allotments will be maintained at

the headquarters unit," and the "remaining proportion . . . will be placed in the care of the

University of Idaho for temporary re-location" to unspecified locations, which "is not within the

authority of the [Sheep Station] to determine." AR 37009. The SIR then asserted that "these

interim actions do not exceed the magnitude of use or the environmental effects that were

considered in the analysis for the headquarters unit" and "falls [*sic*] within the maximum

potential environmental effects" considered in the FEIS. *Id.*

The SIR thus entirely failed to reassess the FEIS' analysis about why modified

Alternative 5, to close the Snakey-Kelly allotments, was unacceptable. According to the FEIS,

such closure would have unacceptable adverse impacts to its herd size and research activities.

But the SIR failed to explain how its sheep grazing patterns and research projects would change

from the "proposed action" in modified Alternative 1 in light of the Forest Service's settlement

that closed Snakey-Kelly. And it failed to evaluate how placing more sheep on Headquarters for longer times, or different times of the year, could impact sage-grouse on the Headquarters property, particularly during breeding, nesting, and brood-rearing seasons.

The cursory assertions of the SIR thus do not meet the "hard look" and "reasoned decision" requirements of NEPA and the APA. *See Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000) (agency "hard look" must be "taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made"). The Court should hold the SIR to be arbitrary and capricious along with the FEIS and ROD, and remand for the Sheep Station to prepare a new and adequate NEPA analysis that candidly assesses and discloses how the Snakey-Kelly closure may affect its future sheep grazing plans and management.

### III.    THE FEIS MISLEADINGLY DESCRIBED THE PROPOSED ACTION, AND WRONGLY DOWNPLAYED IMPACTS TO SENSITIVE SPECIES WHILE OVERSTATING ITS "RESEARCH MISSION."

As noted above, the Sheep Station and ASI try to fault Plaintiffs for pointing out that the Sheep Station has outlived its usefulness and its funding has been proposed to be eliminated in many recent appropriations requests, asserting that NEPA "does not provide for judicial review of congressional priorities" nor "require a discussion of the societal value of the Sheep Station's research." *See* Def. Br. at 1, 6; ASI Br. at 1-3.

Of course, Plaintiffs do not suggest the Court should review congressional funding decisions or "priorities." But what the Court does review is whether the FEIS and ROD complied with NEPA by accurately and fully considering all relevant factors and a reasonable range of alternatives. *See Kraayenbrink*, 632 F.3d at 491–93. This means the "societal importance" of the Sheep Station's research is not beyond the scope of NEPA analysis required here. As the CEQ

regulations explain, when "economic or social and natural or physical environmental are interrelated," the NEPA analysis must discuss "all of these effects on the human environment." 40 C.F.R. § 1508.14.

Here, the FEIS and ROD rely on misleading assertions about the supposed importance of continuing historic grazing to serve the Sheep Station's "research mission," and to reject all alternatives to close some or all of the Sheep Station's grazing allotments that would avoid or reduce wildlife conflicts. *See* AR 31011–13, 31031–32, 31088–92 (FEIS); AR 37018–24 (ROD). Indeed, the FEIS flatly misrepresented the proposed action (modified Alternative 1) in claiming it was "no new federal action, just a continuation of the historical and ongoing grazing and associated activities," AR 31079, without acknowledging the allotment closures beginning in 2009 when it halted sheep grazing on the Meyers Creek and East Summer Range allotments pending ESA consultation, and in 2013 when it agreed to halt use of Meyers Creek and the East and West Summer Ranges for several years until legal and environmental issues were resolved. *See* Plfs. SOF ¶¶ 20–25; Def. SOF ¶¶ 20–25.

How did those closures affect the Sheep Station's ongoing research projects over the last decade, or its potential future research? The Court, Plaintiffs, and the public have no idea, because the FEIS ducked addressing those questions. Similarly, as discussed above, the SIR and ROD also avoided addressing how the Snakey-Kelly closure might affect the Sheep Station's ongoing and future research activities, much less reevaluate the FEIS's assertions that closing those allotments would pose major and unacceptable impacts to Sheep Station research. The false and misleading portrait of the selected alternative (modified Alternative 1) as "continuing historic and ongoing grazing" thus confirms Plaintiffs' showing that the Sheep Station failed to accurately and fairly evaluate alternatives, violating NEPA. *See* Plfs. Br. at 17–19.

The FEIS also improperly minimized potential impacts to sensitive wildlife species in countless ways, only some of which were identified in Plaintiffs' opening brief and SOF. Its discussion of the Lionhead bighorn sheep herd in Idaho is just one example. The FEIS's Figure 37 shows this herd area right next to the East Summer Range, *see* AR 31156, and the record confirms it is located less than 1.5 miles from East Summer, 3 miles from Meyers Creek, and 9 miles from the West Summer Range. AR 20875. Yet the FEIS stated—erroneously—that the Lionhead herd "is separated from the East and West Summer Ranges . . . by a distance of approximately 20 miles," AR 31155. The FEIS then dismissed the likelihood of adverse impacts from Sheep Station grazing by reiterating that the "Hilgard bighorn herd in Montana (Lionhead Herd in Idaho) is over 17 miles away from the nearest ARS property (Summer East pasture)" and "[i]nteraction between domestic sheep on ARS properties and existing bighorn sheep herds is not known or expected to occur." AR 31159.

The Sheep Station argues that the Court must defer to its "scientific expertise and judgment" here, because the Sheep Station supposedly decided that Montana had "more complete and reliable data" about the Lionhead/Hilgard bighorn herd. *See* Def. Br. at 18. But the point of the FEIS is to candidly disclose and evaluate all potential adverse impacts—not pick and choose among state agency wildlife data to downplay potential adverse impacts and promote the agency's pre-determined outcome. *See Kraayenbrink,* 632 F.3d at 492 (NEPA requires a "discussion of adverse impacts that does not improperly minimize negative side effects").

Similarly, with respect to grizzly bears, the Sheep Station defends the FEIS's failure to provide any telemetry or other monitoring data after 2009 by arguing that closure of Meyers Creek in 2009 was mentioned, and the FEIS assumed that it and the East and West Summer Ranges may be occupied by grizzly bear. *See* Def. Br. at 14–17. But the level of potential grizzly

bear presence and use of these areas is critical to understanding the severity of risks posed by

Sheep Station grazing on them. Grizzly bears could be impacted directly on those allotments by

coming into contact with the sheep or their herders, and indirectly by the sheep/human presence

causing them to avoid or abandon the habitat. Knowing how extensive grizzly bear use and

activities are on those allotments is vital to assessing potential impacts, which the FEIS did not

provide in relying on stale data and assumptions that conflicts would be avoided or minimized,

again requiring reversal. *See WildEarth Guardians v. Montana Snowmobile Ass'n*, 790 F.3d 920,

924–27 (9th Cir. 2015); *N. Plains Res. Council,* 668 F.3d at 1084–87 (both reversing where

agency NEPA analysis relied on inadequate or stale wildlife data to evaluate potential impacts).

 In the end, the Court must evaluate the FEIS, SIR, and ROD in their entirety to determine

whether the Sheep Station took the "hard look" at effects and alternatives that NEPA requires,

and whether they provide the "detailed relevant information concerning significant

environmental impacts" needed to foster informed decision-making. *WildEarth*, 790 F.3d at 924

(*quoting Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 249 (1989)). The Court

must "strictly interpret the procedural requirements in NEPA [and the implementing regulations]

to the fullest extent possible consistent with the policies embodied in NEPA." *Id.* at 924. The

Sheep Station has failed those NEPA tests, requiring the Court to reverse and remand for the

Sheep Station to prepare a fully NEPA-compliant EIS and ROD.

## **CONCLUSION**

 For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion

for summary judgment and reverse and remand the FEIS, SIR, and ROD.

DATED:  April 9, 20120   Respectfully submitted,

         */s/ Laird J. Lucas*
         Laurence ("Laird") J. Lucas (ISB # 4733)

Bryan Hurlbutt (ISB # 8501)
Garrison Todd (ISB # 10870)

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 9, 2020, I electronically filed the foregoing PLAINTIFFS' COMBINED REPONSE/REPLY SUMMARY JUDGMENT BRIEF through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Christine England
Assistant U.S. Attorney
christine.england@usdoj.gov

Caroline Lobdell
clobdell@wrlegal.org

Cherese De'Dominiq McLain
cdm@msbtlaw.com

*/s/ Laird J. Lucas*
Laurence ("Laird") J. Lucas