## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, WILDEARTH GUARDIANS, and CENTER FOR BIOLOGICAL DIVERSITY, | Case No.: 1:19-cv-00065-REB |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER RE:** |
| vs. | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** (Dkt. 20) |
| U.S. SHEEP EXPERIMENT STATION, and USDA AGRICULTURAL RESEARCH SERVICE, | **DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** (Dkt. 24) |
| Defendants, | **DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT** (Dkt. 26) |
| and | |
| AMERICAN SHEEP INDUSTRY ASSOCIATION, INC., | |
| Defendant-Intervenor | |

Pending before the Court are the following motions: (1) Plaintiffs' Motion for Summary Judgment (Dkt. 20); (2) Defendants' Cross-Motion for Summary Judgment (Dkt. 24); and (3) Defendant-Intervenor's Cross-Motion for Summary Judgment (Dkt. 26). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. **RELEVANT BACKGROUND**

Through this action, Plaintiffs Western Watersheds Project, WildEarth Guardians, and Center for Biological Diversity (collectively "Plaintiffs") seek to require Defendant U.S. Sheep Experiment Station ("Sheep Station") to comply with federal law in its authorization of domestic sheep grazing within habitat for bighorn sheep, grizzly bear, greater sage-grouse, and other wildlife species. In particular, Plaintiffs allege that the July 2017 Final Environmental Impact

**MEMORANDUM DECISION AND ORDER - 1**

Statement ("FEIS") and related July 2018 Record of Decision ("ROD") (alongside the accompanying Errata and Supplemental Information Report ("SIR")) failed to analyze the direct and indirect effects of Sheep Station grazing on certain U.S. Forest Service ("USFS") and Department of Energy ("DOE") lands used for Sheep Station grazing, while minimizing grazing's impacts on vulnerable species – each in violation of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA").  The relevant factual/procedural backdrop is organized chronologically as follows:

**A.    The Sheep Station**

1.    The Sheep Station is operated by Defendant USDA Agricultural Research Service ("ARS"); ARS is the principal in-house research arm of the United States Department of Agriculture ("USDA").  *See* Pls.' SOF No. 1 (Dkt. 20-2).  The Sheep Station supports research using domestic sheep owned by the University of Idaho ("UI").  *See id.*

2.    Sheep Station properties owned by ARS include the Headquarters Property, the Humphrey and Henninger Ranches, and the East and West Summer Ranges – these properties are located north of Dubois, Idaho and total approximately 48,330 acres.  *See id.* at SOF No. 4.

3.    The Sheep Station also utilizes nearly 20,000 acres of other public land allotments ("non-ARS allotments") through Memoranda of Understanding with federal agencies, including the Mud Lake Feedlot (administered by DOE) and the Snakey-Kelly Canyons, East Beaver, and Meyers Creek allotments (administered by USFS). [1]  *See* Pls.' SOF No. 5 (Dkt. 20-2).[2]

---

[1]  Defendants claim that Plaintiffs have incorrectly identified the names of the allotments and have incorrectly categorized the Mud Lake Feedlot as an allotment.  *See* Defs.' Resp. to Pls.' SOF No. 6 (Dkt. 23-1).  Any discrepancies in these respects are immaterial to the resolution of the parties' arguments.

[2]  The Sheep Station also previously utilized the Bernice allotment on Bureau of Land Management ("BLM") lands, but BLM ended sheep grazing there in 2012, citing the risk to bighorn sheep.  *See* Pls.' SOF No. 6 (Dkt. 20-2).

**MEMORANDUM DECISION AND ORDER - 2**

4.      Sheep Station/ARS properties and non-ARS allotments are identified in the following map (as depicted in the FEIS):



*See* AR 31271.[3]

5.      The Sheep Station lands and allotments are predominantly located in and around the Upper Snake River Plain and the Centennial Mountains.  The Centennials run east-west along the Idaho/Montana border and connect Yellowstone National Park – as well as the Greater Yellowstone Ecosystem ("GYE") around it – with large wilderness and roadless areas in Idaho and Montana.  *See id*. at SOF No. 17.  These lands and the Centennials' connectivity corridor provide habitat for many wildlife species, including grizzly bear, bighorn sheep, lynx, wolverine, gray wolves, and others.  *See id.*

_____

[3]  The Bernice allotment is not depicted on the map, but is located west of the Mud Lake Feedlot and southwest of the Snakey-Kelly Canyons allotments.

**MEMORANDUM DECISION AND ORDER - 3**

B.      **Procedural Background**

6.      In 2007, Plaintiffs filed a prior lawsuit in this Court (Case No.: 4:07-cv-00279-BLW), "seek[ing] a declaration that Defendants[4] have violated and continue to violate federal laws . . . in authorizing, permitting, and allowing the grazing of sheep on roughly 100,000 acres of federal land utilized by the [Sheep Station] in eastern Idaho and southwest Montana." *See id.* at SOF No. 18 (citing AR 30602-03). Plaintiffs also sought injunctive relief to redress the injuries caused by the alleged violations of law. *See id.* The parties reached a settlement, requiring completion of a NEPA analysis by November 28, 2008. *See id.* (citing AR 30650 ("[ARS] shall prepare an 'environmental assessment' ('EA') or 'environmental impact statement' ('EIS'), pursuant to [NEPA], regarding the grazing of sheep and related activities on [Sheep Station] lands. The associated Decision Notice and Record of Decision shall be completed and signed on or before November 28, 2008.")).

7.      The Sheep Station did not meet that deadline. Instead, the Sheep Station issued an "interim" decision on November 28, 2008, allowing its sheep grazing to continue until 2010 without NEPA analysis. *See id.* at SOF No. 19 (citing AR 31011 ("This decision allowed the Sheep Station to continue historical and ongoing grazing operations through March 2010, the time estimated to prepare a longer term environmental assessment of our grazing and associated activities project.")).

8.      Then, in 2010, the Sheep Station issued a Decision Notice in response to the 2009 relisting of the GYE grizzly bear under the Endangered Species Act ("ESA"), an action which halted sheep grazing on the Meyers Creek allotment and East Summer Range pending ESA consultation and completion of an EIS. *See id.* at SOF No. 20 (citing AR 373-74 ("As a result,

_____

    4  The named Defendants in the 2007 action were the Sheep Station, USDA, ARS, and USFS. *See* AR 30602.

**MEMORANDUM DECISION AND ORDER - 4**

the [ARS] has halted work on the environmental assessment for the U.S. Sheep Experiment

Station Grazing and Associated Activities Project 2009 and will begin the environmental impact

statement process to assess the effects of ongoing and historic grazing and associated activities

on the [Sheep Station], Dubois, Idaho.  It is therefore necessary to address continued

authorization of grazing activities after March 2010 until completion of the EIS, and new

information related to the grizzly bear.")).  Thus, the last time the Meyers Creek allotment and

the East Summer Range were used by the Sheep Station, prior to the issuance of the at-issue

FEIS, was in 2008/2009.  *See id.* (citing AR 1572).[5]

    9.    In July 2011, the Sheep Station issued a Draft EIS ("DEIS").  *See id.* at SOF No.

22 (citing AR 403).  However, after BLM decided in 2012 that it would not renew sheep grazing

authorization on the Bernice allotment, the Sheep Station characterized that decision as a

"changed circumstance" and said it would initiate a "supplemental DEIS" process in early 2013.

*See id.* (citing AR 1704, 1528-29).  Eventually, in March 2016, the Sheep Station issued a

"Revised DEIS" for public comment.  *See id.* (citing AR 30707).

    10.    Plaintiffs submitted extensive comments throughout the EIS process, emphasizing

that the Sheep Station needed to fully analyze all adverse impacts of Sheep Station grazing on

grizzly bear, bighorn sheep, sage-grouse, and other wildlife, and evaluate a full range of

alternatives, including ceasing Sheep Station grazing to protect wildlife and other environmental

values.  *See id.* at SOF No. 23 (citing AR 20864, 32349, 32411, 35237, 38298).

---

    [5]  Sheep Station grazing was also halted on the West Summer Range in 2013, following
Plaintiffs' challenge in this Court (Case No.: 4:13-cv-235-BLW) to the U.S. Fish and Wildlife
Service's 2011 Biological Opinion determination that grazing would not jeopardize GYE grizzly
bears' continued existence.  *See* Pls.' SOF No. 21 (Dkt. 20-2); *see also* AR 30656.  According to
Plaintiffs, that prohibition was extended "after UI declined to allow the Sheep Station to graze on
those lands [(including the Meyers Creek allotment and the East Summer Range)] until the legal
and environmental issues were resolved."  *See id.* (citing *Cottonwood Envtl. Law Ctr. v. U.S.
Sheep Experiment Station*, No. 9:14-cv-00192-DLC (D. Mont. June 23, 2014), ECF No. 55-1).

**C.      FEIS, ROD, Errata, and SIR**

11.      In July 2017, ARS issued its first-ever FEIS for the Sheep Station, titled "U.S.

Sheep Experiment Station Grazing and Associated Activities Project."  *See id*. at SOF No. 2

(citing AR 31005-448).[6]  "Modified Alternative 1" (from a total of five possible "modified

alternatives") was chosen as the "Preferred Alternative," which provides:

> Modified Alternative 1 (Proposed Action) – No New Federal
> Action: **Preferred Alternative**.  This alternative proposes no new
> federal action and to continue historical and ongoing grazing and
> associated activities necessary to achieve the mission of the station.
> Grazing currently occurs on Headquarters Range, Henninger and
> Humphrey Ranches, and East and West Summer Ranges.   In
> addition, the following . . . [USFS] allotments are utilized:  Snakey-
> Kelly, East Beaver, and Meyers Creek.

*See id*. (citing AR 31009 (emphasis in original)).  Under Modified Alternative 1, the Sheep Station

would conduct sheep grazing on all of the ARS properties and non-ARS allotments historically

used by the Sheep Station (except for the Bernice allotment).  *See id*. at SOF No. 7 (citing AR

31050-51).[7]

12.      Even though Modified Alternative 1 involves both ARS properties and non-ARS

allotments, the FEIS only contains consideration of the effects (direct and indirect) of the

---

[6]  The FEIS indicates that "[t]he purpose of the proposed action is to achieve the research goals and objectives of the Sheep Station . . .; which are to develop integrated methods for increasing production efficiency of sheep and simultaneously improve the sustainability of rangeland ecosystems."  AR 31028; *see also* AR 31040 ("[T]he project is being proposed to prepare documentation, pursuant to [NEPA], for Sheep Station activities and to identify the best course of action to achieve the research goals and objectives that will fulfill its mission [(identified as "develop[ing] integrated methods for increasing production efficiency of sheep and simultaneously to improve the sustainability of rangeland ecosystems")].").

[7]  Plaintiffs point out that Modified Alternative 1 "proposed to resume grazing at prior levels on the East and West Summer Ranges and Meyers Creek allotment, even though sheep grazing was suspended there during the NEPA process."  Pls.' Mem. ISO MSJ, p. 5 (Dkt. 20-1); *see also supra* (noting that sheep grazing had stopped on Meyers Creek allotment and East Summer Range in 2008/2009, and West Summer Range in 2013); *infra* (discussion of this apparent discrepancy as basis for Plaintiffs' NEPA/APA violation claim).

**MEMORANDUM DECISION AND ORDER - 6**

proposed action on ARS properties (the Headquarters Property, the Humphrey and Henninger Ranches, and the East and West Summer Ranges) – and *not* on non-ARS allotments (the Snakey-Kelly Canyons, East Beaver, and Meyers Creek allotments).  *See id.* at SOF No. 9 (citing AR 31102).[8]  Addressing this decision, the FEIS language suggests that, elsewhere (but not in the FEIS itself), distinct NEPA analyses for grazing on the non-ARS allotments already exist.  *See* AR 31102 ("Separate NEPA analyses were prepared and decisions were made by the respective agencies to authorize sheep grazing on the lands they administer.  It is neither required nor appropriate that the Sheep Station revisit these decisions.  Thus, this [FEIS] analyzes the direct/indirect effects of the proposed actions on ARS properties only.").

13. During this same timeframe, in October 2017, Plaintiffs filed litigation in this Court (Case No.: 1:17-cv-00434-CWD), "challeng[ing] Defendant [USFS's] 2017 authorization of domestic sheep grazing on the Snakey Canyon and Kelly Canyon allotments within the Caribou-Targhee National Forest because of the grave risk to the small South Beaverhead population of Rocky Mountain bighorn sheep" (the "Snakey-Kelly Action").  *W. Watersheds Project v. U.S. Forest Serv.*, No. 1:17-cv-00434-CWD (D. Idaho Oct. 17, 2017), ECF No. 1.

14. In November 2017, U.S. Magistrate Judge Candy Dale granted Plaintiffs' motion for preliminary injunction in the Snakey-Kelly Action, enjoining the grazing of domestic sheep on the Snakey-Kelly Canyons allotments during the then-scheduled six-week 2017/2018 fall and winter grazing season.  *See W. Watershed Project v. U.S. Forest Serv.*, 2017 WL 5571574, *15

---

[8]  The actual acreage of the non-ARS allotments is uncertain – Plaintiffs' Complaint initially alleges they encompass over 30,000 acres (*see* First Am. Compl., ¶ 21 (Dkt. 3)); Plaintiffs later imply they "total 24,086 acres, or about 50% the size of the ARS Sheep Station properties" (based on undated maps within the Administrative Record) (Pls.' SOF No. 8 (Dkt. 20-2)); and Defendants state that the Snakey-Kelly Canyons allotments actually amount to 5,800 acres (not the 13,000 acres Plaintiffs claim) (*see* Defs.' Resp. to Pls.' SOF No. 8 (Dkt. 23-1)). Regardless of its true number of acres, suffice it to say, the non-ARS allotments' actual geographic footprint (and import to the Sheep Station's mission) is understood to be significant.

(D. Idaho 2017).  A June 2018 settlement agreement in the Snakey-Kelly Action provided that "[USFS] will not authorize any domestic sheep grazing or trailing on the Snakey Canyon or Kelly Canyon allotments unless or until an analysis consistent with NEPA is completed."  *W. Watersheds Project v. U.S. Forest Serv.*, No. 1:17-cv-00434-CWD (D. Idaho June 29, 2018), ECF Nos. 44-47.

15.    On July 23, 2018, ARS issued an ROD, adopting the FEIS's Preferred Alternative/Modified Alternative 1, with "[m]inor adjustments."  *See* Pls.' SOF No. 3 (Dkt. 20-2) (citing AR 37013-70).[9]

16.    The ROD's Appendix C represents an "Errata for the [FEIS]," highlighting purported "errors or points-of-clarification" within the FEIS, while contemporaneously providing "correct[ions]" to the same.  *See id.*  For example (and as relevant here), the FEIS states in pertinent part (as to Modified Alternative 1's direct and indirect effects on sage-grouse):

> This alternative would continue grazing practices as currently constituted.  From mid-January to mid-April there would be no effect to sage-grouse, because all sheep would be on the Headquarters feedlots.   From mid-April through mid-June, approximately 3,300+ sheep would be grazing the Headquarters pastures.  Although this could affect sage-grouse breeding, nesting, and early brood-rearing activity, conservation measures are in place that would minimize impacts and interactions of sheep with sage-grouse *by avoiding leks, known nesting areas, and known early brood-rearing areas*.  Therefore, the effects to sage-grouse during this period would not greatly reduce productivity.  From late June to early July (2 weeks) about 2,000 sheep would be moved north . . . .

---

[9] It is unclear why the ROD was issued a full year after the FEIS, especially when the ROD's cover page includes a date of "September 2017."  *Compare* AR 37013 (cover page), *with* AR 37031 (signature page).  Separately, as to the referenced "minor adjustments," the ROD states that "[a] review of the adjustments has been conducted and the agency has determined that the effects are within the range of effects analyzed in the FEIS (see [SIR])."  AR 37018; *see also id.* (ROD further stating:  "Although the decision includes grazing the [USFS] Snakey-Kelly Allotments, these allotments will not be utilized (i.e., no sheep grazing will occur) until the [USFS] authorizes use for sheep grazing (see [SIR]).");  *infra* (discussing nature of SIR).

**MEMORANDUM DECISION AND ORDER - 8**

AR 31171 (emphasis added).  However, the ROD's Errata revises the above-purported erroneous language as follows:

> FEIS, page 161, subsection Sage-grouse Direct and Indirect Effects, *Modified Alternative 1*, first paragraph, third sentence:  Delete "+" and "by avoiding leks, known nesting areas, and known early brood-rearing areas" and adjust the sentence to read, "From mid-April through mid-June, approximately <u>3,300 (including lambs)</u> sheep would be grazing the Headquarters pastures.  Although this could affect sage-grouse breeding, nesting, and early brood-rearing activity, conservation measures are in place that would minimize impacts and interactions of sheep with sage-grouse <u>by implementing short duration and rest-rotation grazing practices.</u>"

AR 37069-70 (emphasis in original).  According to Plaintiffs, the Errata did not undergo public notice and comment.  *See* Pls.' Mem. ISO MSJ, p. 6 (Dkt. 20-1).

17.  Also on July 23, 2018, ARS issued an SIR "to document the review and consideration of several pieces of information, determine if the information has significant or relevant bearing on the analysis of the proposed action in the FEIS, and determine if additional analysis is needed . . . ."  Pls.' SOF No. 3; *see also* AR 37008.  Among other things, the SIR specifically considered "[a] June 2018 decision by [USFS] to not authorize any domestic sheep grazing or trailing on the Snakey-Kelly allotments until a NEPA analysis is completed" (in effect, the outcome of the intervening Snakey-Kelly Action before Judge Dale (*see supra*)).  AR 37008.

18.  With respect to the Snakey-Kelly Action and the now-unavailable Snakey-Kelly Canyons allotments for grazing, the SIR states:

> As described under the preferred modified alternative 1, the action includes grazing the [USFS] Snakey-Kelly allotments with a proportion of the flock from November through early January each year.  The remaining proportion of the flock graze at the Sheep Station's headquarters or are housed at the Mud Lake unit.  The number of sheep at each location is based on research needs, available forage, climate conditions, and efficiency of use.

**MEMORANDUM DECISION AND ORDER - 9**

The Sheep Station will not graze the [USFS] Snakey-Kelly allotments until the [USFS] completes a NEPA analysis. During the period that the Snakey-Kelly allotments remain unavailable for sheep grazing:

- The flock inventory will be reduced from the targeted 3,000 mature sheep but remain within the range that is necessary to accomplish research objectives (FEIS, p. 36).

- A proportion of the sheep that would normally be scheduled to graze Snakey-Kelly allotments will be maintained at the [H]eadquarters unit.

- The remaining proportion of the sheep that would normally be scheduled to graze Snakey-Kelly allotments will be placed in the care of [UI] for temporary re-location from as early as November through as late as January. [UI] is an ARS cooperator at the Sheep Station and is the owner of the sheep flock.

The agency has determined that these interim actions do not exceed the magnitude of use or the environmental effects that were considered in the analysis for the [H]eadquarters unit. Specifically, the effects of reducing the number of mature sheep and grazing a proportion of remaining sheep at the [H]eadquarters unit falls within the maximum potential environmental effects considered in the analysis (FEIS, pp. 36 and 40) and addressed in the environmental consequences (FEIS, pp. 91-227) for Alternative 1.

[UI's] temporary re-location of sheep in their care is not within the authority of the agency to determine.

. . . .

The unavailability of the Snakey-Kelly allotments was considered as new information, and the agency concludes that this information does not necessitate a correction, supplement, or revision to the FEIS for the Sheep Station Grazing and Associated Activities Project. The analysis included in the July 28, 2017 FEIS encompasses potential effects of the temporary loss of the Snakey-Kelly allotments. If and when the [USFS] Snakey-Kelly allotments become available, grazing will resume as described under alternative 1 of the FEIS.

AR 37008-09, 12. Ultimately, although the unavailability of the Snakey-Kelly Canyons

allotments was "new information," the SIR concluded such information did not require a

**MEMORANDUM DECISION AND ORDER - 10**

"correction, supplement, or revision to the FEIS" because "[t]he analysis included in the July 28, 2017 FEIS encompasses potential effects of the temporary loss of the Snakey-Kelly allotments." AR 37012.[10]  Plaintiffs aver that the SIR did not undergo public notice and comment.  *See* First Am. Compl., ¶ 38 (Dkt. 3).

**D.    The Instant Action**

19.    Plaintiffs filed this lawsuit on February 20, 2019, later amending their Complaint on March 12, 2019.  *See generally* Pls.' Compl. (Dkt. 1); First Am. Compl. (Dkt. 3).  Through three claims, Plaintiffs allege that the FEIS, ROD, Errata, and SIR each violate NEPA and APA. *See* First Am. Compl., ¶¶ 114 (Dkt. 3).

20.    On December 23, 2019, Plaintiffs moved for summary judgment, arguing that the Sheep Station (1) violated NEPA in refusing to assess direct and indirect impacts on non-ARS allotments; (2) failed to take a hard look at the impacts of grazing on vulnerable species; and (3) violated NEPA by misstating and exaggerating the effects of the discarded alternatives.  *See* Pls.' Mem. ISO MSJ, pp. 9-19 (Dkt. 20-1).

21.    Defendants Sheep Station and ARS, along with Defendant-Intervenor American Sheep Industry Association, Inc. ("ASI"),[11] disagree, opposing Plaintiffs' summary judgment

---

[10]   Despite the SIR's claim that (1) the unavailability of the Snakey-Kelly Canyons allotments can be accommodated by a reduction in flock inventory and re-proportioned grazing (of those reduced numbers) elsewhere (namely, the Headquarters Property), and (2) the FEIS contemplates the loss of the Snakey-Kelly Canyons allotments, Plaintiffs reference the FEIS's and ROD's juxtaposed contention that closing the Snakey-Kelly Canyons allotments under Modified Alternative 5 would have "a major impact" to the Sheep Station's research program and reduce sheep numbers by 40%.  *See* Pls.' SOF Nos. 15-16 (Dkt. 20-2) (citing AR 31079-89, 37013-23); *see also* Pls.' Mem. ISO MSJ, p. 7 (Dkt. 20-1) ("The SIR and ROD failed to acknowledge the FEIS's prior contention that closing Snakey-Kelly would have a 'major impact' on the Sheep Station research program, and refused to reevaluate whether the FEIS's analysis of the various alternatives remained valid in light of the loss of the Snakey-Kelly allotments.").

[11]   On November 26, 2019, the Court granted ASI's Motion to Intervene (Dkt. 7), following the parties' November 21, 2019 Stipulation (Dkt. 16).  *See* 11/26/19 Order (Dkt. 18).

efforts and filing their own cross-motions for summary judgment on January 30, 2020 and

February 13, 2020 respectively.  *See* Defs.' MSJ (Dkt. 24); D.I.'s MSJ (Dkt. 26).

22.     On August 20, 2020, the Court conducted a hearing on the parties' cross-motions

for summary judgment.

## II.  LEGAL STANDARDS

### A.    Administrative Procedure Act ("APA")

NEPA compliance is reviewed under the APA, as NEPA does not provide a private right

of action.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882-83 (1990) (stating that judicial

review of agency action proceeds under APA where statute at issue, NEPA, does not provide

cause of action).  Under the APA, an agency action must be upheld unless it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  "A [decision] is arbitrary and capricious 'if the agency has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise.'"  *Providence Yakima Med. Ctr. v. Sebelius*, 611 F.3d 1181, 1190 (9th Cir.

2010) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463

U.S. 29, 43 (1983)).

The "touchstone of 'arbitrary and capricious' review under the APA is 'reasoned

decision-making.'"  *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061,

1080 (9th Cir. 2019) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52).  Courts sustain an

agency action if the agency has "examine[d] the relevant data and articulate[d] a satisfactory

explanation for its action including a 'rational connection between the facts found and the choice

made.'"  *Id*. (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation omitted)).

**MEMORANDUM DECISION AND ORDER - 12**

This standard also applies to how an agency considers and responds to "significant comments" that raise points that could change a decision. *Id.* (quoting *Am. Mining Congress v. EPA*, 965 F.2d 759, 771 (9th Cir. 1992) (internal quotation omitted)).

Summary judgment is typically appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, in a case involving review of a final agency action under the APA, the court's role is limited to reviewing the administrative record, and the standard set forth in Rule 56 does not apply. *See Colorado River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191, 200 (D.D.C. 2012) (citing *Catholic Health Initiatives v. Sebelius*, 658 F. Supp. 2d 113, 117 (D.D.C. 2009), *rev'd on other grounds*, 617 F.3d 490 (D.C. Cir. 2010)). Rather, under the APA, "it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id.* (citation omitted); *see also Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 769 (9th Cir. 1985). Summary judgment is then the mechanism for deciding whether, as a matter of law, the agency action passes muster under the APA. *See N.w. Motorcycle Ass'n v. U.S. Dep't Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994); *Occidental Eng'g*, 753 F.2d at 769-70.

In considering whether an agency's action was arbitrary and capricious, courts should be "highly deferential" to the agency's decision, *Providence Yakima*, 611 F.3d at 1190, and not "substitute [the court's own] judgment for that of the agency." *J & G Sales Ltd. v. Truscott*, 473 F.3d 1043, 1051 (9th Cir. 2007). "[C]ourts will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* at 1052 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). "Moreover, '[w]here the agency's line-drawing does not appear irrational and

**MEMORANDUM DECISION AND ORDER - 13**

the [party challenging the agency action] has not shown that the consequences of the line-drawing are in any respect dire . . . [courts] will leave that line-drawing to the agency's discretion.'" *Id*. (quoting *Leather Indus. of Am. v. EPA*, 40 F.3d 392, 409 (D.C. Cir. 1994)). However, the agency cannot engage in post-hoc rationalizations; "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87 (1943).  Further, when an agency changes position, it must provide "good reasons" for the shift.  *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Despite this forgiving standard, there is no room for a court to "rubber-stamp" an administrative decision.  Instead, the court must make "a substantive inquiry[,] . . . a thorough, probing, in-depth review" of the agency action.  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 960 (9th Cir. 2005) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971)).  If, after such review, the court holds an agency action to be arbitrary and capricious, "the proper course [is] to remand to the [a]gency."  *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 657 (2007); *see also Fed. Power Comm'n v. Idaho Power Co.*, 344 U.S. 17, 20, (1952) (when reviewing administrative decision, "the function of the reviewing court ends when an error of law is laid bare.").

## B.     National Environmental Policy Act ("NEPA")

NEPA encourages "'productive and enjoyable harmony between man and his environment,' and was intended from its outset to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321).  Particular results are not mandated, but NEPA does "prescribe[ ] the necessary process" to avoid "uninformed – rather than unwise – agency action."  *Robertson v. Methow*

**MEMORANDUM DECISION AND ORDER - 14**

*Valley Citizens Council*, 490 U.S. 332, 350-351 (1989).  Council on Environmental Quality ("CEQ") regulations guide federal agencies' compliance with NEPA.  *See* 40 C.F.R. §§ 1500.1-1508.28.

At its core, NEPA requires that agencies prepare a detailed statement – an EIS – in connection with "proposals for . . . major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  Among other things, an EIS must include an explanation of "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action."  *Id*. at §§ 4332(C)(i)-(iii).  The process of preparing the EIS "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts" and that "the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision."  *Robertson*, 490 U.S. at 349.  "[T]he broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time."  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989).

In deciding whether an EIS is required (*i.e.*, will the proposed project have a significant effect on the human environment?), the responsible agency may first prepare an Environmental Assessment ("EA") to assist in making that decision.  40 C.F.R. §§ 1501.3-1501.4.  A "concise public document," the EA is used to "briefly" discuss "the environmental impacts" and "alternatives" to the proposed action.  40 C.F.R. § 1508.9.  If the decision is that an EIS is not necessary, an explanatory Finding of No Significant Impact ("FONSI") is required, to "briefly present…why an action . . . will not have a significant effect on the human environment."  40 C.F.R. § 1508.13.

**MEMORANDUM DECISION AND ORDER - 15**

"Courts apply a 'rule of reason' standard in reviewing the adequacy of a NEPA document" – asking whether it "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004) (quoting *Churchill Cty v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001)).  "This inquiry involves 'a pragmatic judgment whether the [document's] form, content, and preparation foster both informed decision-making and informed public participation.'" *Protect Our Cmtys. Found. v. LaCounte*, 939 F.3d 1029, 1035 (9th Cir. 2019) (quoting *Churchill Cty.*, 276 F.3d at 1071); *see also California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982).  To accomplish this, "NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005) (citation omitted).

Hence, there is a salutary, critical role of the NEPA process in agency decision-making, the importance of which has been described in myriad agency decisions and court decisions over many decades.  When properly implemented, NEPA procedures "ensure[ ] that the agency will inform the public that it has indeed considered environmental concerns in its decision-making process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983); *see also* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.").  However, while "a court must '[e]nsure that the agency has taken a hard look at environmental consequences,' a court cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 913 (9th Cir. 2018) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)); *see also Bair v. Cal. State Dep't of Transp.*, 867 F. Supp. 2d 1058, 1065 (N.D. Cal. 2012) ("Once the agency does the required hard look, it is free to choose to proceed with action that will have an adverse impact on the

**MEMORANDUM DECISION AND ORDER - 16**

environment, at least insofar as NEPA is concerned, the idea being that if we are going to destroy the environment, we should do so with ou[r] eyes wide open and not by accident.").

### III.  DISCUSSION

**A.    The Sheep Station Violated NEPA by Not Adequately Addressing the Direct and Indirect Effects of Its Domestic Sheep Grazing Operation on Non-ARS Allotments**

The FEIS's Modified Alternative 1 – its Preferred Alternative – indisputably endorses the utilization of non-ARS allotments (*i.e.*, the USFS's Meyers Creek, East Beaver Creek, and Snakey-Kelly Canyons allotments, and the DOE's Mud Lake Feedlot) for the purposes of continuing the Sheep Station's historical and ongoing grazing activities.  *See supra* (citing AR 31009).  Yet, the FEIS expressly does not analyze the direct and indirect effects of the Sheep Station's domestic grazing operation on these non-ARS allotments, claiming instead that "[s]eparate NEPA analyses were prepared and decisions were made by the respective agencies to authorize sheep grazing on the [non-ARS allotments]" and, moreover, that "[i]t is neither required nor appropriate that the Sheep Station revisit these decisions."  AR 31102.  The FEIS therefore implies the existence of NEPA documentation vis à vis the non-ARS allotments, ostensibly speaking to Modified Alternative 1's direct and indirect impacts on such non-ARS allotments.  In response, Plaintiffs argue that "[t]his assertion that NEPA analysis existed for these allotments is demonstrably untrue . . . and violates NEPA."  Pls.' Mem. ISO MSJ, p. 9 (Dkt. 20-1).  The Court agrees.

Relying on 40 C.F.R. §§ 1506.3(a)-(c),[12] Plaintiffs submit that, not only does the FEIS "not even identify the other NEPA analyses it supposedly relied on to avoid addressing grazing

---

[12]  Agencies may adopt an EIS provided it "meets the standards for an adequate [EIS] under [the CEQ] regulations" and it (as a "cooperating agency") undertakes "an independent review of the [EIS]" and "concludes that its comments and suggestions have been satisfied."  40 C.F.R. §§ 1506.3(a), (c); *see also* 40 C.F.R. § 1506.3(b) ("If the actions covered by the original [EIS] and the proposed action are substantially the same, the agency adopting another agency's

impacts on the non-ARS allotments," no valid NEPA documents even exist for the non-ARS

allotments that the FEIS could have realistically relied upon (or, for that matter, circulated for

review).  *See id*. at pp. 10-12.  This appears to be true, as the FEIS does not specifically cite to

other agency-generated NEPA analyses or decisions.  *See* Pls.' SOF No. 9 (Dkt. 20-2) (citing AR

31005-448 (entire FEIS)).[13]  And, the documents (1) mentioned elsewhere in the FEIS (a 1963

Memorandum of Understanding ("MOU") for the Mud Lake Feedlot and a 2007 FS categorical

exclusion ("CE") for the Meyers Creek allotment) and (2) nonetheless available within the

administrative record itself (a 1996 EA for multiple grazing allotments including East Beaver

Creek and a 1998 EA for the Beaver Creek Drainage Vegetation Management Plan), likewise do

not amount to NEPA analyses addressing the *current* direct and indirect effects of sheep grazing

on the non-ARS allotments (again, a component of the FEIS's Preferred Alternative).  *See* Pls.'

Mem. ISO MSJ, pp. 10-11 (Dkt. 20-1); Pls.' SOF Nos. 10-13 (Dkt. 20-2) (citing AR 1769-76,

1777-88, 1834-39, 1880-83, 31433, 36758-62, 36999-37001, 52047-107, 52108-261).[14]

---

statement is not required to recirculate it except as a final statement.  Otherwise the adopting
agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c)
of this section).").

   [13]  In this respect, Defendants quote another passage of the FEIS, stating only that "we
also have written agreements in place to use lands administered by other federal agencies," that
certain of these lands "are included in [the FEIS] as appropriate (as cumulative effects)," and that
their "use of these allotments is covered under separate agreements with those agencies."  Defs.'
Resp. to Pls.' SOF No. 9 (Dkt. 23-1) (quoting AR 31036).  Whatever "agreements" these may be
(the Court has no reason to doubt their existence), they cannot be the NEPA analyses the FEIS
refers to.  To be sure, Defendants go on to state that their use of the non-ARS allotments is
"covered separately by the appropriate [NEPA] documentation" – confirming/re-stating what the
FEIS already says by way of apparently-available NEPA documentation.  *Id*.  But, to Plaintiffs'
point, Defendants neither identify where in the FEIS these NEPA analyses are identified, nor do
they identify those analyses in and of themselves, calling into question their existence to
substantiate what the FEIS claims to be the case (that direct and indirect impacts of sheep
grazing to non-ARS allotments have already undergone NEPA analyses).  *See infra*.

   [14]  And, of course, no valid NEPA analysis even exists for the Snakey-Kelly Canyons
allotments as highlighted by the Snakey-Kelly Action and its resulting prohibition of domestic

**MEMORANDUM DECISION AND ORDER - 18**

Defendants do not seem to dispute these points.  *See, e.g.*, Defs.' Mem. ISO MSJ, p. 8, n.4 (Dkt. 24-1) (admitting that FEIS was "partially incorrect" in that Mud Lake Feedlot did not undergo NEPA analysis, but that such error is harmless "because it did not preclude informed decision-making and public participation or otherwise materially affect the substance of the agency's decision."); *id.* at p.10, n.6 (Dkt. 24-1) (arguing that 40 C.F.R. § 1506.3's requirements do not apply because "[t]he Sheep Station does not contend that it adopted the environmental analyses of other agencies.").  Rather, they contend that (1) the FEIS already "contains an extensive discussion of effects on non-ARS lands," and (2) the Sheep Station's actions do not trigger NEPA in any event "because the Sheep Station cannot utilize non-ARS lands without authorization from the appropriate agency."  *Id.* at pp. 9-11.  These arguments are not persuasive.

1.  <u>Intermittent "Discussions" of Certain Non-ARS Allotments Within the FEIS Does Not Equal an Evaluation of the Direct and Indirect Effects of Sheep Grazing On Non-ARS Allotments</u>

Attempting to justify the Sheep Station's analysis of the effects of its sheep grazing on non-ARS allotments, Defendants argue that (1) the FEIS discusses "in great detail" the USFS's Meyers Creek and Snakey-Kelly Canyons allotments when it assesses the potential effects of

---

sheep grazing/trailing there indefinitely *until* a NEPA analysis is completed.  *See supra*. Defendants and Defendant-Intervenor argue that this (after-the-) fact makes any challenge to grazing on the Snakey-Kelly Canyons allotments moot.  *See* Defs.' Mem. ISO MSJ, pp. 8-9 (Dkt. 24-1) (citing to SIR (AR 37008) and stating:  "Following the issuance of the FEIS, the [USFS] did not authorize grazing on the Snakey-Kelly Allotments.  As a result, the Sheep Station may not conduct any activities on the Snakey-Kelly Allotments unless and until the [USFS] authorizes it to do so.  Because the Sheep Station may not operate on the Snakey-Kelly Allotments, Plaintiffs' claim related to these allotments is moot."); *see also* D.I.'s Mem. ISO MSJ, pp. 9-10 (Dkt. 26-1) (arguing that "Plaintiffs' challenge(s) to grazing on the Snakey-Kelly allotments is moot" because no grazing is permitted there).  But because the FEIS, ROD, and SIR clearly contemplate sheep grazing on the Snakey-Kelly Canyons allotments (either in the first instance or once the USFS re-opens them), Plaintiffs' related challenges are not resolved. Moreover, the Snakey-Kelly Canyons allotments' effective closure (at least for the time being) arguably undermines the FEIS's analysis of alternatives and conclusion that such a closure would have a major impact on the Sheep Station, thus justifying Modified Alternative 1's adoption over other possible alternatives, namely Modified Alternative 5.  *See infra*.

**MEMORANDUM DECISION AND ORDER - 19**

sheep grazing on grizzly bear, lynx, and bighorn sheep; (2) the FEIS analyzes the effects on all

non-ARS allotments as part of its "cumulative effects analysis and in comparing alternatives";

and (3) Plaintiffs fail to identify any potential effects on non-ARS allotments that were not

disclosed in the FEIS. *See id*. at p. 9; *see also* Defs.' Reply ISO MSJ, p. 2 (Dkt. 32) (endorsing

FEIS's "*extensive* analysis" of non-ARS allotments via FEIS's analysis of potential effects on

grizzly bear on Meyers Creek allotment, bighorn sheep on Snakey-Kelly Canyons allotments,

and sage-grouse on East Beaver and Snakey-Kelly Canyons allotments (emphasis in original));

D.I.'s Mem. ISO MSJ, p. 10 (Dkt. 26-1) ("Regardless, the USSES did consider direct and

indirect effects reasonably associated with the project, including on non-ARS lands.").   The

Court largely disagrees.

There is, in fact, a discussion of those animal species' habitats/ranges (including

applicable non-ARS allotments), made hand-in-hand with addressing the impacts of the Sheep

Station's grazing operation on these same animal species, within the FEIS.[15]  But that discussion

(even if complete and accurate) is more contextual in that particular setting and neither fills nor

supplants the duty to separately examine the direct and indirect effects of the sheep grazing on

those same areas – in short, one does not equal the other.[16]  The very text of the FEIS

unequivocally acknowledges as much by stating: "[T]his [FEIS] analyzes the direct/indirect of

---

[15]  To this point, the Court acknowledges that, throughout the FEIS, sections are devoted to "affected environment" and "direct and indirect effects." *See, e.g.*, AR 31123-34.  However, these sections (and others) are ARS properties and/or species-specific and crafted accordingly; though oblique references to non-ARS allotments exist therein, their focus is not on the effects of grazing on non-ARS allotments.

[16]  Still, even a look at the alleged correlation between an analysis of grazing's effects on these animals and the involved non-ARS allotments highlights shortcomings that further undermine Defendants' claim that, in addressing Sheep Station grazing's impacts on vulnerable species, the FEIS simultaneously speaks to the direct and indirect effects on non-ARS allotments. *See infra* (addressing whether Sheep Station took hard look at impacts of grazing impacts on vulnerable species).

the proposed actions *on ARS properties only*."  AR 31102 (emphasis added).  There is no

substance to support an argument made in hindsight that the FEIS does something that it

expressly disclaims.

The same can be said for any attempt to address sheep grazing's direct and indirect

effects on non-ARS allotments by invocation of the FEIS's cumulative effects analyses and/or its

comparison of alternatives.  *See, e.g.*, *id*. (FEIS stating:  "The effects of grazing on the allotments

and feed lot are considered in the cumulative effects analyses).[17]  Again, even if there is

inevitably some degree of overlap in these reviews, any attempt to argue that one (the FEIS's

cumulative effects and alternatives analyses) subsumes the other (the absent direct and indirect

effects analyses on non-ARS allotments) for the purposes of conducting a proper NEPA inquiry

is problematic.  This is evident in that, as part of the reviews, the FEIS assumes that certain ARS

properties and non-ARS allotments are currently being used by Sheep Station operations when,

in fact, they are not (*see supra*).  *See, e.g.*, AR 31119 (discussing spatial boundary for range

cumulative effects as including ARS properties and non-ARS allotments, stating:  "Use of these

lands is part of the overall grazing strategy for the Sheep Station to carry out their mission.").

This reality undermines any claim that the FEIS's as-is cumulative effects analyses adequately

address direct and indirect effects of sheep grazing on non-ARS allotments – it simply cannot

and does not do so in any objectively meaningful and consistent way.

Finally, it is incorrect to assert – as Defendants seek to do in discounting the FEIS's

glossing over the effects of the Sheep Station's actions on non-ARS allotments – that Plaintiffs

---

[17]  The Court further acknowledges that the FEIS contains sections that variously compare "resource effects by alternative," "range cumulative effects" by alternative, and "cumulative effects" by resource and activity.  *See, e.g.*, AR 31093-99, 31119-23, 31139-40, 31159, 31195.  But these cumulative effects sections are mostly cursory and general, discussing larger geographic footprints rather than discrete non-ARS allotments, while repeating the Sheep Station's position that no adverse cumulative effects are expected from any of its activities.

**MEMORANDUM DECISION AND ORDER - 21**

have not specifically identified any potential effects on non-ARS allotments that were not already disclosed in the FEIS. This "no harm no foul" argument overlooks Plaintiffs' simultaneous claim that the FEIS fails to take a hard look at the impacts of grazing on certain vulnerable species (namely, bighorn sheep, grizzly bear, and sage-grouse) that occupy or surround these non-ARS allotments – an integral component of Plaintiffs' challenge to the FEIS here. *See, e.g.*, Pls.' Mem. ISO MSJ, pp. 12-17 (Dkt. 20-1). Moreover, Plaintiffs repeatedly alerted the Sheep Station about these concerns (and more) in the years leading up to the 2017 FEIS and 2018 ROD. *See, e.g.*, AR 20865 (in 2011, stating in part: "Throughout the year, the sheep grazed on Sheep Station lands are also grazed on BLM, [USFS], and [DOE] lands. The grazing of sheep and related activities on these BLM, [USFS], and [DOE] parcels are connected, cumulative, and similar actions, thereby requiring that the overall environmental impacts of the Sheep Station sheep grazing and associated activities on all these lands must be considered within the EIS."); AR 32350 (same in 2016, but excluding reference to BLM parcel(s) owing to cessation of grazing on Bernice allotment in 2012); AR 20867-71, 20875-78, 32355-76, 32411-60, 35237-44 (following FEIS but before ROD).

2. Authorizations to Use the Non-ARS Allotments Do Not Exempt the Sheep Station From Its Duties Under NEPA to Fully Evaluate the Direct and Indirect Effects of Its Grazing on Non-ARS Lands

NEPA requires that federal agencies taking any "major Federal action[ ] significantly affecting the quality of the human environment" prepare an EIS. 42 U.S.C. § 4332(C)(i). Major federal actions include all actions "which are potentially subject to Federal control and responsibility." 40 C.F.R § 1508.18. The scope of an EIS extends to "connected, cumulative, and similar actions." *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1046 (9th Cir. 2013).

Here, the "proposed action" studied in the FEIS is "to continue historical and ongoing grazing and associated activities" on both ARS properties and non-ARS allotments. AR 31011;

**MEMORANDUM DECISION AND ORDER - 22**

*see also* AR 31028 ("In pursuit of these goals and objectives, the Sheep Station staff has conducted sheep grazing operations on Sheep Station property and other permitted allotments for 100 years.  The Sheep Station proposes to continue sheep grazing and associated activities currently occurring on Sheep Station properties; [USDA], [USFS] allotments; and a feedlot on [DOE] land (proposed action) . . . .").  Even so, Defendants argue that the FEIS did not even have to address the non-ARS allotments because the Sheep Station cannot utilize the non-ARS allotments without the predicate authorization from the appropriate agencies (USFS and DOE). *See* Defs.' Mem. ISO MSJ, p. 10 (Dkt. 24-1) ("However, because the [DOE] and [USFS] authorize any Sheep Station use of their lands, any NEPA challenge must be directed at those agencies. . . .  NEPA does not require the Sheep Station to analyze the potential effects of using non-ARS lands because the Sheep Station cannot do so without authorization from the appropriate agency."); *see also* D.I.'s Mem. ISO MSJ, p. 9 (Dkt. 26-1).  According to Defendants, if Plaintiffs "challenge the sufficiency of the analysis conducted by the [USFS] or the [DOE] in authorizing grazing, Plaintiffs must lodge their challenge against the agency with jurisdiction to authorize the action."  Defs.' Mem. ISO MSJ, p. 10 (Dkt. 24-1) (citing *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 644 (9th Cir. 2014)).[18]  Defendants' reliance on *San Luis* on this point is misplaced.

---

[18]  Except there are no other NEPA analyses to challenge.  *See supra* (critiquing FEIS's reference at AR 31102 to "[s]eparate NEPA analyses were prepared and decisions were made by the respective agencies to authorize sheep grazing on the lands they administer"); *see also* Pls.' Resp./Reply ISO MSJ, p. 5 (Dkt. 30) ("There are no other adequate NEPA analyses for the non-ARS lands").  Defendants counter by stating that "any enterprising plaintiff [could] challenge whether the [USFS] and the [DOE] complied with NEPA in authorizing the Sheep Station's use of their property," essentially arguing that, if any NEPA analysis is required as to the non-ARS allotments, it is the responsibility of those agencies that authorized the Sheep Station's use of the corresponding non-ARS allotments for research purposes in the first place, not the Sheep Station and/or ARS.  Defs.' Mem. ISO MSJ, pp. 10-11 (Dkt. 24-1) (citing AR 31036-37 (referencing 2006 and 2017 agreements relating to USFS grazing allotments and 1963 MOU (predating NEPA) relating to DOE Mud Lake Feedlot)).

**MEMORANDUM DECISION AND ORDER - 23**

In *San Luis*, the Ninth Circuit reversed a ruling that the Fish and Wildlife Service

("FWS") violated the ESA in issuing a Biological Opinion limiting Bureau of Reclamation

("BOR") operation of the Central Valley Project to reduce impacts on the threatened San

Francisco Bay delta smelt. *San Luis*, 747 F.3d at 581-638.  However, the Ninth Circuit affirmed

that FWS's issuance of the Biological Opinion was not a "major Federal action significantly

affecting the quality of the human environment," such that FWS was not obligated to complete

an EIS; instead, it was BOR's subsequent *implementation* of FWS's Biological Opinion that

triggered BOR's obligations under NEPA as the action agency.  *See id*. at 644 ("[T]here is no . . .

need to require FWS to prepare an EIS because [BOR] stands ready to do so.  *We have held that*

*an agency need not complete an EIS where another agency will authorize or implement the*

*action that triggers NEPA*. . . .  We see no reason to require a consulting agency like FWS to

complete an EIS when an action agency like [BOR] will either (1) prepare an EIS when it

implements FWS's proposal or (2) reject FWS's proposal and prepare an EIS on whatever

alternative it implements." (emphasis added)).  The Ninth Circuit therefore held that FWS was

not required to comply with NEPA when it issued the Biological Opinion because "its

implementation is contingent on [BOR's] adoption of the [Biological Opinion], which is an

action that will trigger [BOR's] obligation to complete an EIS."  *Id*. at 645.

Defendants acknowledge the holding in *San Luis*, even referencing the same language

quoted above.  *See* Defs.' Mem. ISO MSJ, p. 10 (Dkt. 24-1).  But their attempt to draw upon that

holding to sidestep NEPA's mandates ignores the fact that ARS already completed an FEIS that

contemplates the Sheep Station's use of ARS properties and non-ARS allotments alike,[19] and

_____

[19]  In this sense, while *San Luis* helps to highlight who must issue an EIS and when, ARS
has already issued an EIS that is supposed to extend to "connected, cumulative, and similar
actions." *W. Watersheds Project*, 719 F.3d at 1046; *see also San Luis*, 747 F.3d at 643 ("And
even if [BOR] felt compelled to implement FWS's proposal, we must bear in mind that [BOR]

**MEMORANDUM DECISION AND ORDER - 24**

fundamentally diverges from *San Luis's* instruction.  To be clear, the Sheep Station/ARS implemented the permits/authorizations granted by USFS and/or DOE as part of their proposed action "to continue historical and ongoing grazing and associated activities" on ARS properties and non-ARS allotments – as the action agency, the Sheep Station/ARS authorized the (proposed) action that triggers (indeed, actually triggered) NEPA.

**B.     The Sheep Station Violated NEPA by Not Taking a Sufficiently Hard Look at the Impacts of Its Domestic Sheep Grazing Operation on Certain Vulnerable Species**

It is well-established and not disputed that NEPA requires an action agency to take a hard look at the environmental consequences of a proposed federal action.  *See supra*; *compare also* Pls.' Mem. ISO MSJ, pp. 8-9 (Dkt. 20-1), *with* Defs.' Mem. ISO MSJ, pp. 3-4 (Dkt. 24-1).  By its very existence, the FEIS attempts to satisfy this standard by, among many other things, speaking specifically to the proposed action's "environmental consequences," including "resource effects" pertaining to range and wildlife.  *See* AR 31101-80.  Plaintiffs claim this analysis is lacking, arguing that the FEIS's consideration of the impacts of sheep grazing on certain vulnerable species (bighorn sheep, grizzly bears, and sage-grouse) omits crucial information, uses unsupported claims, and provides incomplete and outdated information to reach a predetermined conclusion (namely, that the Sheep Station's domestic sheep grazing operation does not negatively impact these species).  *See* Pls.' Mem. ISO MSJ, pp. 12-15 (Dkt. 20-1).  The Court addresses each argument in turn below.

1.     The FEIS's Discussion of Domestic Sheep Grazing's Impacts to Bighorn Sheep is Incomplete and Confusing

---

will complete an EIS evaluating the effects of implementing the [Biological Opinion]."). So, the question here is not whether an EIS gets prepared and/or by who (what *San Luis* resolves), but what is appropriately included within the EIS. NEPA's "hard look" requirement extends to an evaluation of, among things, the direct, indirect, and cumulative effects caused by agency action and possible alternatives. *See supra*. In the geographic setting created by the Sheep Station's proposed action, this includes effects on, and alternatives involving, non-ARS allotments.

North America has lost over 90 percent of its bighorn sheep and most remaining herds are small and vulnerable.  In part, this is because bighorn sheep are susceptible to respiratory disease caused by pathogens spread by domestic sheep.  *See* Pls.' SOF No. 27 (Dkt. 20-2); *see also* AR 31153 (FEIS stating:  "In the Rocky Mountain west, a primary issue regarding bighorn sheep and domestic sheep interaction revolves around die-offs within native or transplant bighorn sheep herds, after coming in contact with domestic sheep. . . .  The majority of documented bighorn sheep die-offs follow contact with domestic sheep.").  This risk is exacerbated because (1) domestic sheep sometimes stray from their band even under "best management practices" ("BMPs"), and (2) bighorn sheep sometimes roam many miles outside their home range on "forays."  *See* Pls.' SOF Nos. 29-30 (Dkt. 20-2); *see also* AR 31154-55 (FEIS discussing "Payette National Forest Decision" involving rate of contact between bighorn sheep and domestic sheep population using "large telemetry data set to model core herd home ranges and bighorn sheep forays outside of home ranges . . . .").  Minimizing interactions between bighorn sheep and domestic sheep logically reduces such risks, accomplished, in part, by maintaining/increasing distances between the species.[20]

The FEIS repeatedly says that Preferred Alternative/Modified Alternative 1 would not endanger bighorn sheep because any bighorn sheep herds are approximately 20 miles away.  *See* AR 31153 ("Bighorn sheep herds nearest to ARS properties are approximately 20 miles removed from all Sheep Station activities and separated by non-habitat such that interactions are not expected to be a concern with these herds."); AR 31155 ("The boundary of bighorn sheep

---

[20]  Plaintiffs submit that, in light of straying domestic sheep and bighorn sheep forays, studies show that bighorn sheep and domestic sheep should be kept 12 to 25 miles apart to prevent disease transmission.  *See* Pls.' SOF No. 30 (Dkt. 20-2) (citing AR 1672).  Defendants do not expressly disagree, except to say that "Plaintiffs cite no scientific evidence for this claim, but cite to a letter submitted to ARS from the national Wildlife Federation."  Defs.' Resp. to Pls.' SOF No. 30 (Dkt. 23-1) (citing AR 1672).

**MEMORANDUM DECISION AND ORDER - 26**

Population Management Units nearest ARS properties are roughly 20 miles away (see [map at

Figure 37].”); AR 31158 (indicating Hilgard/Lionhead herd “is over 17 miles away from the

nearest ARS property (Summer East pasture) . . . .  Interaction between domestic sheep on ARS

properties and existing bighorn sheep herds is not known or expected to occur.”).

     However, the actual map purporting to locate such herds, contained in the FEIS, paints a

markedly different picture:



*See* AR 31156 (Figure 37 map titled:  “Bighorn Sheep Affected Environment”).[21]  On that map,

the Hilgard/Lionhead herd on the Montana/Idaho border is *much closer* to two ARS properties

(the East and West Summer Ranges) and one non-ARS allotment (the Meyers Creek allotment).

_____

     [21]  Plaintiffs claim that the Hilgard/Lionhead herd “is less than 1.5 miles from the Sheep
Station’s East Summer Range, less than 3 miles from the Meyers Creek allotment, and less than

**MEMORANDUM DECISION AND ORDER - 27**

Defendants downplay this disconnect, claiming that, "[b]ased on the available information, the Sheep Station reasonably concluded that [the Hilgard/Lionhead] herd is separated by twenty miles and significant topography, including Henry's Lake basin and the continental divide, from any Sheep Station activities."  Defs.' Mem. ISO MSJ, p. 17 (Dkt. 24-1). To this end, Defendants source the above-referenced map to the Idaho Department of Fish & Game ("IDFG"), contending that it contains IDFG's "limited information" on the Hilgard/Lionhead herd, whereas the Montana Fish, Wildlife & Parks ("MFWP") keeps more detailed information on this herd.  *Id*. at p. 18 (citing AR 43611, 43428-29, 47271-76, 36739). According to Defendants, "[t]he Sheep Station reviewed the information of both state agencies [Idaho and Montana], disclosed [IDFG's] map of its assessment of the herd's location, and reasonably concluded that the more complete and reliable data was provided by [MFWP]." Defs.' Mem. ISO MSJ, p. 18 (Dkt. 24-1) (quoting AR 31155 (FEIS stating:  "Although the Idaho Bighorn Sheep Management Plan delineates the Lionhead population management unit closer to ARS property, there is no indication that a herd occupies the area adjacent to Toms Creek and/or Odell Creek grazing units.[22]  Neither the Idaho Fish and Game Bighorn Sheep Progress Report (2009), nor the Montana Bighorn Sheep Conservation Strategy (2010), or the Idaho Bighorn

---

9 miles from the West Summer Range."  Pls.' SOF Nos. 31-32 (citing AR 20875, 31156, 27208). The Court is unable to verify these exact distances using Plaintiffs' references to the record, but acknowledges that the FEIS's Figure 37 reflects distances of much less than 20 miles between the Hilgard/Lionhead herd and the East/West Summer Ranges and Meyers Creek allotment. Further, in the Snakey-Kelly Action, Judge Dale found that, "[b]ased on a ruled map of the area and other evidence in the record, it appears the straight-line distance between the South Beaverhead population's core herd home range and the [Snakey-Kelly Canyons] allotments is approximately 10 to 12 miles."  *See W. Watershed Project v. U.S. Forest Serv.*, 2017 WL 5571574 at *8 (internal citations omitted).

[22]  It is unclear what this exactly means geographically-speaking, with the FEIS indicating that the East and West Summer Ranges "include Odell Creek, Big Mountain, and Toms Creek grazing units."  AR 31155.  Whether a heard occupies *other* areas adjacent to the East and West Summer Ranges (or a non-ARS allotment) is unknown (at least to the Court).

**MEMORANDUM DECISION AND ORDER - 28**

Sheep Management Plan (2010) suggests any known interaction between the Hilgard/Lionhead herd and Sheep Station grazing activities.  According to the Idaho Fish and Game Bighorn Sheep Progress Report, 12-15 sheep are seen in Idaho during the summer months.")).  "In making this determination," say Defendants, "the Sheep Station exercised its scientific expertise and judgment" which is "entitled to great deference."  Defs.' Mem. ISO MSJ, p. 18 (Dkt. 24-1) (citing *Envtl. Def. Ctr., Inc. v. U.S. E.P.A.*, 344 F.3d 832, 869 (9th Cir. 2003)); *see also* Defs.' Reply ISO MSJ, pp. 8-9 (Dkt. 32).

The deference given to an agency to proceed with a particular action follows the agency's hard look at the environmental consequences of that action.  In other words, unless there is such a precedent hard look at the action's environmental consequences, there is no deference to be had.  Here, Defendants' argument that the Sheep Station relied on the best available information when stating matter-of-factly in the FEIS that bighorn sheep population boundaries are 20 miles away from ARS properties (and non-ARS allotments) is not supported by the agency's own FEIS.  As described above, the very map offered to demonstrate the Hilgard/Lionhead herd's distance from potential Sheep Station grazing plots flatly contradicts any claim that a 20-mile separation exists.  *See supra* (citing AR 31156).  This is seemingly supported elsewhere in the record as well.  *See* AR 27208 (map titled: "Idaho: Domestic Sheep & Bighorn Sheep Interaction").  That the record may also contain conflicting information that now supports Defendants' argument does not undo what is (and, importantly, what is not) *contained in the FEIS* on the issue of impacts of domestic sheep grazing to bighorn sheep.

Separately, even though Defendants now criticize IDFG's institutional knowledge about the Hilgard/Lionhead herd, the FEIS (and even Defendants) reference its studies about the herd's apparent limited interactions with Sheep Station grazing activities.  *See supra* (citing AR 3115).  At best, this is inconsistent, incomplete, and/or confusing; at worst, it evidences cherry-picked

**MEMORANDUM DECISION AND ORDER - 29**

data to support the Sheep Station's preferred alternative – and, in either case, without any real counterpoint discussion within the FEIS.

Additionally, any suggestion that *only* 12-15 bighorn sheep are seen in Idaho during the summer months somehow corresponds to a sufficient buffer between bighorn and domestic sheep discounts the FEIS's discussion of the population objection for the already-small Hilgard/Lionhead herd (80-120 in number).  *See* AR 3115 (referencing population counts in 2012-2016.  If anything, these limited numbers make it all the more critical that appropriate distances be maintained between bighorn and domestic sheep.

Finally, where the FEIS also relies on BMPs to protect the Hilgard/Lionhead herd from disease transmission, it should be noted that, in the subsequent Snakey-Kelly Action, the court was not convinced (at least as to the Beaverhead herds near the Snakey-Kelly Canyons allotments), stating:

> [A]lthough the [USFS] posits likelihood of irreparable harm cannot be shown by the available, admittedly scant evidence of contact or potential contact, the Court finds the [USFS's] own guidance points to the evidence of risk of irreparable harm in this case:  proximity. It is the proximity between the domestic sheep grazed on the Snakey-Kelly Canyons allotments to the South Beaverhead population that demonstrates likelihood of irreparable harm.  *Even with flawless execution of BMPs, there is no way the Sheep Station or [USFS] can ensure that domestic sheep will not wander, and that South Beaverhead rams will not make forays on or near the allotments while the large herds of domestic sheep are grazing.*

*W. Watershed Project v. U.S. Forest Serv.*, 2017 WL 5571574 at *13 (emphasis added).  While the later-in-time SIR did discuss the unavailability of the Snakey-Kelly Canyons allotments, it did not confront that court's assessment of the ineffectiveness of BMPs to prevent diseases from spreading to bighorn sheep population.

The point of this is not to once-and-for-all resolve the question of how far apart the Hilgard/Lionhead herd is from potential Sheep Station activities, but to underscore that the

**MEMORANDUM DECISION AND ORDER - 30**

FEIS's discussion of the possible environmental consequences of those activities on bighorn sheep is insufficiently incongruous and therefore not reasonable.  On this record, the Sheep Station did not take the requisite hard look at the impacts of its domestic sheep grazing operation on bighorn sheep.

    2.    <u>The FEIS's Discussion of Domestic Sheep Grazing's Impacts on Grizzly Bears Is Misleading At Times</u>

The grizzly bear's importance to the GYE (and vice versa) cannot be understated.  The GYE contains one of the handful of remaining grizzly bear populations in the continental United States, a population numbering over 100 grizzly bears.  *See* Pls.' SOF No. 33 (Dkt. 20-2).  As to the impact of the Sheep Station's activities on grizzly bears, Plaintiffs challenge the FEIS's analysis of grizzly bear/domestic sheep conflicts, arguing that, by using misleading statements and omissions, the Sheep Station downplays those risks and thus fails to fully consider domestic sheep grazing's impacts on grizzly bears.  *See* Pls.' Mem. ISO MSJ, pp. 14-15 (Dkt. 20-1).  The Court agrees that the data used to discuss sheep grazing's impacts on grizzly bears is occasionally misleading, and therefore a problem.[23]

To begin, Modified Alternative 1 contemplates that the Meyers Creek allotment would be used for trailing sheep to and from the East Summer Range pasture.  AR 31127, 31748-52, 31079-81.  As to whether that practice impacts grizzly bears, the text of the FEIS touts the paucity of grizzly bear/sheep encounters "over the last 10 years despite the known presence of

---

[23]  Plaintiffs also argue that the FEIS improperly discounts the importance of grizzly bear habitat connectivity in the Centennial Mountains.  *See* Pls.' Mem. ISO MSJ, p. 14 (Dkt. 20-1) (citing *Crow Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1014-21 (D. Mont. 2018)). This Court does not read the FEIS as ignoring the importance of connectivity, but that the Steep Station's limited operations within the GYE and the grizzly bear Primary Conservation Area ("PCA") will not affect grizzly bear movement and, likewise, not affect its genetic diversity.  *See* Defs.' Mem. ISO MSJ, pp. 12-14 (Dkt. 24-1) (citing AR 31180-84); *see also* Pls.' Mem. ISO MSJ, p. 14 (Dkt. 20-1) (noting "grizzly population has been expanding into the Centennials"). That Plaintiffs may disagree with this conclusion is not enough.

grizzly bears occupying the habitat," going on to state that, "[i]n the past five years, there have

been no reported grizzly bear/livestock conflicts on the [USFS] Meyers Creek allotment."  AR

31133; *see also* AR 31137 (noting "limited number of previous encounters" where "[t]he Sheep

Station had a total of 5 grizzly bear/sheep interactions over a two year period (2007 and 2008)

which represents a period where they had more grizzly bear interactions than typical," before

projecting three encounters per year, over ten year period "considering the low number of

historical encounters on the Sheep Station which peaked in 2007 and 2008").  Except, to that

point, the Meyers Creek and East Summer Range allotments *had not been grazed* since

2008/2009.  Therefore, there is no value in relying upon a lack of encounters in allotments where

grazing sheep and grizzly bears would not have been present at the same time, potentially

creating a misleading picture of the recent historical number of grizzly bear/sheep conflicts,

while underestimating future ones.  *See supra*.

      It is therefore no wonder that in the years preceding the FEIS, grizzly bear/sheep

encounters peaked in 2007-2008 and trended down thereafter – encounters are minimized

without sheep.  But this disconnect is not altogether unexpected when understanding that

Modified Alternative 1 simply "continues" the Sheep Station's "historic and ongoing" grazing,

including on the Meyers Creek allotment and East Summer Range property (even though these

areas had not been grazed for the previous decade).  *See supra*.  Modified Alternative 1 actually

calls for re-opening these areas to grazing; it does not, simply, endorse a grazing status quo.  *See*

Pls.' Resp./Reply ISO MSJ, p. 10 (Dkt. 30) (arguing that FEIS "wholly failed to address the

larger impacts on GYE grizzly bear of re-opening Meyers Creek and East Summer Range to

Sheep Station grazing under Modified Alternative 1" which "will reduce the existing protections

for GYE grizzly bear within the PCA, set back progress made under the conservation strategy,

and risk far more human/grizzly and sheep/grizzly encounters than occurred in the last decade,

**MEMORANDUM DECISION AND ORDER - 32**

when they were closed."); *see also* AR (37378-79) (addressing "change in sheep allotments since 1998" within *Yellowstone Grizzly Bear Investigations 2017*: "Domestic sheep allotments on public lands inside the PCA have largely been phased out since 1998[,]" with a "98% net reduction in the acreage grazed by sheep on public lands inside the PCA. . . . Today, only 1 sheep allotment remains active on public lands inside the PCA: the Meyers Creek allotment . . . . The Meyers Creek allotment, part of the [Sheep Station], has consistently been issued a no-use permit since 2008. Consequently, there has been no domestic sheep grazing on public lands inside the PCA for the past 10 years."). In short, introducing the Meyer Creek allotment and East Summer Range back in the Sheep Station's grazing rotation is unquestionably a departure from the norm up to that point in time – something the FEIS did not objectively consider.[24]

Also problematic is the FEIS's reliance upon grizzly bear telemetry location data to help understand grizzly bear activity and habitat types on ARS properties (and the Meyers Creek allotment) – or, more precisely, the (in)accuracy of the telemetry data incorporated into the FEIS. *See* AR 31129. To begin, it is dated (the data only goes until 2009) and vague (the FEIS indicates that five collared grizzly bears used Sheep Station lands, but it does not reveal how many total grizzly bears were actually collared and monitored each year). *See id.*; *see also* AR 52592 (mapping "GPS grizzly bear locations 2000-2009); AR 28224 ("Recent Grizzly Bear Location Map," tracking fewer than 20 grizzly bears); Pls.' Mem. ISO MSJ, p. 15 (Dkt. 20-1)

---

[24] It is true, as Defendants point out, that the FEIS *does* disclose that the Sheep Station stopped grazing on the Meyers Creek allotment in 2008/2009. *See* Defs.' Mem. ISO MSJ, p. 16 (Dkt. 24-1) (citing AR 31393-94). But the *acknowledgement* of that fact is inconsequential when the agency does not mention that inescapably important fact in the FEIS's discussion of historical grizzly bear/sheep conflicts on the Meyers allotment and elsewhere. That the FEIS and record indicate that "there were no grizzly bear conflicts in the five years prior to 2008 on the Meyers Creek allotment" is similarly of limited import. *See* Defs.' Mem. ISO MSJ, p. 16 (Dkt. 24-1) (citing AR 31133, 40028-51972). Not only is this data possibly outdated, it may be explained by reduced grizzly bears during that time. All this is to say that, as of July 2017, an accurate account of grizzly bear/sheep conflicts over time is not contained within the FEIS.

("The information is presented to imply five bears were on Sheep Station land out of the entire GYE population, but the Sheep Station's own map appears to track fewer than twenty bears. A quarter of tracked grizzlies being on Sheep Station lands presents a very different picture than five out of hundreds.") (citing AR 28224).

Defendants disagree, stating that the DEIS "utilized the most recent grizzly data available, citing the 'grizzly bear monitoring results from the Annual Report of the Interagency Grizzly Bear Study Team" for 2014 (edited by van Menan et al. 2015). Defs.' Mem. ISO MSJ, p. 14 (Dkt. 24-1) (citing AR 31127). But this data speaks to grizzly bear populations generally and just adds to the confusion, given that, on the one hand, "the total population estimate in the GYE was estimated at 757 grizzly bears" *in 2014/2015* (AR 31127), whereas on the other hand, five collared grizzly bears used ARS properties and the Meyers Creek allotment since 2001 *as of 2009* (AR 31129). In other words, what is one to reasonably conclude, if anything, from comparing the number of collared grizzly bears found to be on Sheep Station properties as of 2009 against the total number GYE grizzly bears in 2014/2015?

Defendant's argument in this respect simply does not cleanly track. Defendants' retort that using 2009 data was "rational" given that the East Summer Range and Meyers Creek allotment were not used after 2009, is not persuasive. Defs.' Mem. ISO MSJ, p. 15 (Dkt. 24-1) ("As Plaintiffs point out, two of the allotments occupied by grizzly bear were not in use by the Sheep Station after 2009. Since the Sheep Station used the telemetry data to determine whether grizzly bear were utilizing its property, it is rational that the Sheep Station would use data from the time period when sheep were also occupying the property."). This argument more aptly applies in the context of grizzly bear/sheep encounters (*see supra*), not when trying to understand updated grizzly bear utilization of Sheep Station properties to help analyze the impacts of possibly concurrent grazing activities thereon. *See, e.g.*, *See* Pls.' SOF Nos. 35-36 (Dkt. 20-2)

**MEMORANDUM DECISION AND ORDER - 34**

("The FEIS and ROD approved Sheep Station use of the Meyers Creek allotment inside the Grizzly [PCA], *even though a 2012* Biological Opinion from [FWS] found Sheep Station use of Meyers Creek and East Summer Range was 'likely to adversely affect' the grizzly bear and recommended that the Sheep Station find alternatives to the Summer Ranges and Meyers Creek.") (citing AR 27967, 29992 (emphasis added)).

Whether (or to what extent) more complete information would have supported the same decision, or led to a different decision, in the FEIS is uncertain.  Regardless, it is apparent that complete and updated data on the extent of grizzly bear presence/encounters within and/or use of Sheep Station properties is necessary to understand the possible impacts of the proposed action (and alternatives) on GYE grizzly bears.  As is, the FEIS provides only a hazy snap-shot in time of this picture, leaving the Court to conclude that the Sheep Station could not have taken, and did not take, a hard look at the effects and alternatives that NEPA requires to foster informed decision-making.

3.    Plaintiffs' Criticisms of the FEIS as to Sage-Grouse are Not Borne Out

Plaintiffs argue that "the FEIS downplayed the importance of sage-grouse habitats and the threats posed by sheep grazing," with the ROD's Appendix C (Errata) "even eliminat[ing] management restrictions for grazing in sage-grouse habitats on the Headquarters ranch, which the FEIS identified as necessary to reduce conflicts."  Pls.' Mem. ISO MSJ, pp. 4, 16-17 (Dkt. 20-1).  A closer examination of these arguments against the FEIS suggests something different.

First, Plaintiffs submit that the FEIS ignored the fact that sage-grouse BMPs – e.g., attaching reflectors to fences to reduce sage-grouse collisions – "only address part of the problem, since fences provide raptor perches and encourage weed invasions, causing increased predation and habitat abandonment that are caused by fence fragmentation impacts."  *See id*. at p. 16.  Plaintiffs appear to contend that the agency, in preparing the FEIS, did not consider that

**MEMORANDUM DECISION AND ORDER - 35**

existing fencing on Sheep Station property may cause increased predation and habitat

abandonment.  That argument is not supported by the record.  *See, e.g.*, AR 31165-66, 31171,

31272 ("Map 3:  Headquarters Overview"), 31274 ("Map 5: Pasture Fences and Seeding").

Plaintiffs do not end up disputing this in any real, substantive way.  *See generally* Pls.'

Resp./Reply ISO MSJ (Dkt. 30).

      Second, as to the Errata's possible elimination of conservation measures identified in the

FEIS to minimize sheep grazing's impacts on sage-grouse, a more critical look at the record is

necessary.  For example, when discussing Modified Alternative 1's direct and indirect effects on

sage-grouse, the FEIS states that (1) sheep grazing on the Headquarters pastures between mid-

April and mid-June "could affect sage-grouse breeding, nesting, and early brood-rearing

activity," but that (2) "conservation measures are in place that would minimize impacts and

interactions of sheep with sage-grouse *by avoiding leks, known nesting areas, and known early

brood-rearing areas*."  AR 31171 (emphasis added); *see also* AR 31172 ("Given the grazing

conservation measures in place, combined with small, low-frequency proposed prescribed burns

and post-burn area resting, proposed actions are not expected to impact sage-grouse population

stability.").  And, it is true that, a year later, the Errata characterized these conservation measures

as either "errors" and/or necessitating "points of clarification," in turn "correct[ing]" the FEIS by

deleting the originally-stated measures ("avoiding leks, known nesting areas, and known early

brood-rearing areas") and replacing them with measures identified as, simply, "implementing

short duration and rest-rotation grazing practices."  AR 37069-70.  But it is wrong to argue – as

Plaintiffs do – that these changes (and the subsequent SIR) eliminate a major sage-grouse BMP,

violating NEPA's hard look requirement.  *See* Pls.' Mem. ISO MSJ, pp. 4, 16-17 (Dkt. 20-1).

This is especially so when, elsewhere in the FEIS (not addressed by the Errata), "existing

measures to minimize effects of sheep grazing activities" are clearly described:

**MEMORANDUM DECISION AND ORDER - 36**

There are a number of conservation measures employed by the Sheep Station to minimize effects of sheep grazing and proposed activities. They include the following:

- Most leks have been identified on the ground and have previously been inventoried on an annual basis. As a result, the Sheep Station is able to closely monitor sage-grouse breeding populations and submit data to Idaho Game and Fish personnel.

- The Sheep Station employs a grazing strategy that avoids using active lek sites during the courtship season. During the period when leks are active, temporary troughs for watering sheep are specifically placed in locations and pastures without leks, in order to avoid disturbance. Also, full time sheep herders manage the daily movements of sheep and, thus, are able to assist in keeping sheep away from active leks.

- After courtship season, the temporary water troughs are specifically placed in sites that previously had active leks. Concentrated sheep activity keeps shrub encroachment to a minimum, ensuring that leks persist annually and do not become overgrown with big sagebrush.

- Sheep are moved rapidly through pastures which results in minimal disturbance to nesting or brood rearing sage-grouse that might be in the area, and utilization on forbs and grasses remain light. Pasture sizes on the Headquarters vary from approximately 640 acres to 1,100 acres, and sheep are moved through a pasture in six or seven days.

- Reflectors are placed on fences within close proximity to lekking sites and estimated flight zones of sage grouse.

AR 31166.[25] With all this in mind, whatever anomaly that is arguably created by the Errata on

this subject is reconciled by reading the Errata and the FEIS together to mean that (1)

conservation measures are indeed in place to protect sage-grouse from sheep grazing (as

---

[25] It is unclear whether these same measures are sufficient to absorb the increase in sheep numbers at the Headquarters Property following the Snakey-Kelly Canyons allotments' closure. The SIR suggests this is so by stating that "the effects of reducing the number of mature sheep and grazing a proportion of the remaining sheep at the [H]eadquarters unit falls within the maximum potential environmental effects considered in the analysis and addressed in the environmental consequences for Alternative 1." AR 37009 (internal citations omitted). But this raises a separate issue when it comes to the FEIS's consideration of alternatives. *See infra*.

**MEMORANDUM DECISION AND ORDER - 37**

mentioned in the FEIS), and (2) short duration and rest-rotation grazing practices (also identified

in the FEIS) minimize the effects of sheep grazing on sage-grouse (as mentioned in the Errata).

*See* Defs.' Mem. ISO MSJ, p. 20 (Dkt. 24-1).  Again, Plaintiffs do not end up disputing this in

any real, substantive way.  *See generally* Pls.' Resp./Reply ISO MSJ (Dkt. 30).[26]

## C.   The Sheep Station Violated NEPA by Not Objectively Analyzing Certain Discarded Alternatives

Plaintiffs' briefing repeatedly insinuates that the Sheep Station overlooked several of

NEPA's requirements to reach a "predetermined" conclusion, by blindly endorsing Preferred

Alternative/Modified Alternative 1.  *See, e.g.*, Pls.' Mem. ISO MSJ, pp. 13, 17-19 (Dkt. 20-1);

*See* Pls.' Resp./Reply ISO MSJ, pp. 17-18 (Dkt. 30).  This Decision stakes no such emphatic

ground, but the Court does recognize that, taken together, the consolidated FEIS, ROD, Errata,

and SIR materials contain various inconsistencies that could be interpreted as supporting

Plaintiffs' position.  This includes the evaluation of the offered – and ultimately discarded –

alternatives.

The FEIS identifies alternatives to the proposed action (Modified Alternative 1) as

including the elimination of Sheep Station grazing in various non-ARS allotments and the East

and West Summer Ranges (Modified Alternatives 3-5).  *See* AR 31073-86.  However, the FEIS

---

[26] Though not raised in their opening brief, Plaintiffs argue in their response/reply that "the FEIS never evaluated . . . potential impacts [on sage-grouse and sage-grouse habitat] for the Mud Lake Feedlot at all."  *See* Pls.' Resp./Reply ISO MSJ, p. 6 (Dkt. 30).  However, this argument was presented in the context of whether other NEPA analyses exist for the non-ARS allotments (and in direct response to Defendants' claim that the inability of the 1963 MOU for the Mud Lake Feedlot to have undergone a NEPA analysis "[did] not render the Sheep Station's analysis arbitrary and capricious because it did not preclude informed decision-making and public participation or otherwise materially affect the substance of the agency's decision").  *See supra* (quoting Defs.' Mem. ISO MSJ, p. 8, n.4 (Dkt. 24-1)).  The Court has concluded that the Sheep Station violated NEPA by not adequately addressing the direct and indirect effects of its domestic sheep grazing operation on non-ARS allotments.  *See supra*; *see also*  Defs.' Reply ISO MSJ, pp. 3-4 (Dkt. 32) (Defendants arguing that no actual sheep "grazing" takes place on Mud Lake Feedlot where "sheep are fed harvested feed while housed in bare-soil sheep pens").

concludes that any of the alternatives to reduce or eliminate Sheep Station grazing in these areas would interfere with its research mission, thus impairing its ability to utilize the diversity of habitats available on the different Sheep Station grazing lands to conduct genetics and management research. *See* AR 31088-99.  The ROD follows the FEIS in approving Modified Alternative 1, stating that "[i]t is a continuation of the historical and ongoing grazing and associated activities necessary to achieve the mission of the station" and "support rangeland and sheep research to increase the production efficiency of sheep and improve the sustainability of rangeland ecosystems."  AR 37018.  Except the FEIS and ROD fail to acknowledge that allotment closures over the course of the NEPA process have not produced the predicted adverse impacts on the Sheep Station's research activities.

For example, Modified Alternative 3 would end grazing on the East and West Summer Ranges and Humphrey Ranch east of Beaver Creek, as well as on the East Beaver and Meyers Creek allotments, and supposedly require reducing the herd by 50%.  Modified Alternative 5 would end Sheep Station grazing in the Snakey-Kelly Canyons allotments and supposedly require reducing the herd by 40%.  *See* AR 31073-87.  The FEIS claims that both of these alternatives would limit the Sheep Station's research potential.  *See* AR 31089 (FEIS stating that Modified Alternatives 3 and 5 would "ha[ve] a major impact to the program").  But over the course of the last decade, the Sheep Station has lost access to each of these areas for periods of time, *but has nevertheless continued to maintain a herd within or above its ideal size.  See supra* (discussing closures of East Summer Range and Meyers Creek allotment in 2008/2009, West Summer Range in 2013, and Snakey-Kelly Canyons allotments in 2018).

There is no real effort to explain these seemingly important contrasts, with the Sheep Station determining in the SIR that, at least as to the Snakey-Kelly Canyons allotments' closures, the proposed action would not be substantially affected and thus did not require supplemental

**MEMORANDUM DECISION AND ORDER - 39**

NEPA analysis – even though the FEIS posited that a closure of those allotments would seriously impede the Sheep Station's mission. *Compare* AR 37008-09,12, *with* AR 31089-91. What is left, then, is an SIR at apparent odds with the FEIS. Even if one were to set aside whether the Headquarters Property can adequately accept re-proportioned sheep numbers following the Snakey-Kelly Canyons allotments' closure (*see supra*), the conclusion that such a closure apparently would not impact the Sheep Station's mission (at least according to the SIR) raises a serious question as to what else within the FEIS could be overstated. Said another way, what *other* alternatives should not have been set aside by the FEIS if assumptions (as to, for example, how closures involving the East and West Summer Ranges, the Meyers Creek allotment, and the Snakey-Kelly Canyons allotments impacted the Sheep Station's mission) were not quite right? These legitimate questions can (and have been) asked, but there has been no consideration of, nor answer to, such questions in the preparation of a supplemental NEPA analysis. *See* 40 C.F.R. § 1502.9(d)(1)(ii) ("Agencies shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and . . . there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."). In this setting, the SIR itself is arbitrary and capricious, violating NEPA's "hard look" requirement by failing the "reasoned decision" test.[27]

---

[27] This conclusion is independent of any argument that the Sheep Station is beyond its useful life and/or that its costs to the federal taxpayers cannot be justified. *See* Pls.' Mem. ISO MSJ, p. 19 (Dkt. 20-1). Domestic sheep remain an important part of the American livestock industry and research conducted by the Sheep Station has been very important to sheep growers for many decades. Paradoxically, the record reveals that contemporary research conducted at the Sheep Station includes research directed at dealing with the difficult conflicts that exist between the livestock industry and the other species which are found on the public lands. Regardless, the policy and politics of such matters are not for this Court to consider in the context of the issues raised and are not resolved here (though offered by Plaintiffs as additional support for their position). *See* Defs.' Mem. ISO MSJ, p. 5 (Dkt. 24-1) ("But NEPA's purpose is not to shut down duly authorized and funded programs; it is to require a consideration of the potential environmental effects of major federal actions."); *see also* D.I.'s Mem. ISO MSJ, p. 3 (Dkt. 26-

D.      **Conclusion**

The Sheep Station/ARS acted arbitrarily and capriciously under the APA by failing to take the required hard look mandated by NEPA at the impacts of the project by (1) not adequately addressing its direct and indirect effects on non-ARS allotments, (2) not sufficiently examining its impacts on bighorn sheep and grizzly bears, and (3) not objectively analyzing alternatives.  On these issues, Plaintiffs' Motion for Summary Judgment (Dkt. 20) is granted, whereas Defendants' and Defendant-Intervenor's Motions for Summary Judgment (Dkts. 24 & 26) are denied.  As to the issue of whether the Sheep Station/ARS sufficiently examined the project's impacts on sage-grouse, the Court finds that a sufficient hard look was made. Therefore, Plaintiff's Motion for Summary Judgment (Dkt. 20) is denied in this respect, whereas Defendants' and Defendant-Intervenor's Motions for Summary Judgment are granted.

The Court therefore remands the case and will require that, consistent with NEPA and the APA, the Sheep Station/ARS must review on remand the project's direct and indirect effects on non-ARS allotments, as well as its impacts on bighorn sheep and grizzly bears.  Until such a review is completed, sheep grazing/trailing is permitted only to the extent authorized leading up to the June 2017 FEIS.

## IV.  <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that:

1.      Plaintiffs' Motion for Summary Judgment (Dkt. 20) is GRANTED, in part, and DENIED, in part, as follows:

a.      The Sheep Station/ARS did not adequately address the project's direct and indirect effects on non-ARS allotments; did not sufficiently examine the project's impacts on

---

1) ("Plaintiffs' political views do not dictate what [NEPA] requires – that is, a consideration of the potential environmental effects of major federal actions.").

**MEMORANDUM DECISION AND ORDER - 41**

bighorn sheep and grizzly bears; and did not objectively analyze alternatives.  Plaintiffs' Motion for Summary Judgment (Dkt. 20) is granted in these respects.

       b.     The Sheep Station/ARS sufficiently examined the project's impacts on sage-grouse.  Plaintiffs' Motion for Summary Judgment (Dkt. 20) is denied in this respect.

     2.     Defendants' and Defendant-Intervenor's Motions for Summary Judgment (Dkts. 24 & 26) are GRANTED, in part, and DENIED, in part, as follows:

       a.     The Sheep Station/ARS sufficiently examined the project's impacts on sage-grouse.  Defendants' and Defendant-Intervenor's Motions for Summary Judgment (Dkts. 24 & 26) are granted in this respect.

       b.     The Sheep Station/ARS did not adequately address the project's direct and indirect effects on non-ARS allotments; did not sufficiently examine the project's impacts on bighorn sheep and grizzly bears; and did not objectively analyze alternatives.  Defendants' and Defendant-Intervenor's Motions for Summary Judgment (Dkts. 24 & 26) are denied in these respects.

     3.     This action is remanded.  Consistent with NEPA and the APA, the Sheep Station/ARS must review on remand the project's direct and indirect effects on non-ARS allotments, as well as its impacts on bighorn sheep and grizzly bears.  Until such a review is completed, sheep grazing/trailing is permitted only to the extent authorized leading up to the June 2017 FEIS.

DATED: April 16, 2021

_____
Ronald E. Bush
Chief U.S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 42**